John Deere Company, a Missouri Corporation, Plaintiff-Counterdefendant-Appellant, v. Franklin Metzler and Robert Metzler, Partners, d/b/a Metzler Brothers, Defendants-Counterplaintiffs-Appellees.

Gen. No. 10,515.

Fourth District.

September 8, 1964.

341

Bryan, Cave, McPheeters & McRoberts, of St. Louis, Missouri (Gaylord C. Burke and Robert L. Sweney, of counsel), and Brown, Hay & Stephens, of Springfield (Harvey B. Stephens, of counsel), for plaintiff-counterdefendant-appellant.

McGrady and Madden, of Gillespie (D. A. McGrady, of counsel), and George Sullivan, of O'Fallon, Missouri, for defendants-counterplaintiffs-appellees.

SPIVEY, J.

Plaintiff-Counterdefendant-Appellant, John Deere Company of St. Louis, a Missouri Corporation, appeals from a judgment entered by the Circuit Court of Macoupin County upon a jury verdict in favor of defendants-counterplaintiffs-appellees, Franklin Metzler and Robert Metzler, partners, d/b/a Metzler Brothers.

For clarity we shall hereafter refer to the plaintiff-counterdefendant-appellant as John Deere and defendants-counterplaintiffs-appellees as Metzler Brothers.

The action commenced on March 5, 1962, was a simple action in replevin filed by John Deere against Metzler Brothers.

In aid of its replevin action John Deere obtained a temporary injunction without notice and without bond restraining and enjoining Metzler Brothers from taking any action to sell, convey, pledge, transfer or mortgage, or in any way to encumber any of their real or personal property. John Deere filed the customary replevin bond in the amount of $147,000. Metzler Brothers on March 6 filed a forthcoming bond in the amount of $146,974.72 to the replevin action. On Metzler Brothers' motion the temporary injunction was dissolved on March 8, 1962.

Metzler Brothers filed a general denial to the replevin action and a counterclaim in two counts. Count One was an action for breach of the written dealer contract between the parties, and Count Two sounded in tort and charged John Deere with conspiring with its employees and other unnamed persons for the purpose of maliciously and intentionally injuring Metzler Brothers' business.

John Deere answered and denied the material allegations of the counterclaim and added a second count to its action in replevin for moneys owing to it for goods sold and delivered under the written dealer contract.

Prior to trial Metzler Brothers made an unconditional tender in open court to John Deere of most of the items claimed in the replevin action. John Deere accepted this tender and dismissed its replevin count.

Trial was had before a jury on John Deere's complaint for moneys owing to it for goods sold and delivered under the written dealer contract, and Metzler Brothers' counterclaim in two counts for breach of the written dealer contract between the parties and a conspiracy to maliciously and intentionally injure Metzler Brothers' business.

The jury returned a verdict in favor of John Deere on its claim for moneys due in the amount of $11,612.-36; a verdict in favor of John Deere on Count One of Metzler Brothers' counterclaim for breach of contract; and a verdict in favor of Metzler Brothers in the amount of $75,000 on Count Two of the counterclaim charging a conspiracy to maliciously and intentionally injure Metzler Brothers' business. Appropriate judgments were entered on the jury's verdicts.

John Deere's post-trial motions for judgment notwithstanding the verdict and for a new trial on Count Two were denied.

This appeal involves only the judgment entered for Metzler Brothers against John Deere under Count Two

of the counterclaim. No appeal from the judgments on the other two verdicts has been perfected, and at this time they are final.

Count One of Metzler Brothers' counterclaim alleges in effect that since 1922 Metzler Brothers and John Deere have operated under a general agricultural dealer's contract which has been renewed annually and has been in full force and effect up to and including August 31, 1961.

They further allege that they have fully performed all the terms and conditions of said agreement and that notwithstanding said performance on the part of Metzler Brothers, John Deere has failed and refused to perform the terms and conditions of said agreement in the following respects:

In the month of February, 1960, John Deere through its agent, R. J. Baldridge, refused to inspect defective parts which had been replaced by Metzler Brothers so that they could receive credit for replacements as provided in paragraph 24 of the agreement.

In the same month of February, 1960, and thereafter that John Deere failed and refused to carry out its agreement to sell Metzler Brothers agricultural machinery or equipment as provided by paragraph 3(a) of the agreement.

They further allege that as a result of said breaches of the agreement they suffered damage in the amount of $116,598.68.

In Count Two of the counterclaim, after alleging the contractual relationship between the parties, they state they had conducted a highly successful business in the City of Carlinville, Illinois, for the sale and resale of agricultural machinery and had enjoyed the respect and confidence of the farmers, merchants and citizens of the community.

They further allege that on or about December 16, 1959, and thereafter until the present time, John

Deere "by, with, and through its agents, and servants, and by and with certain other persons unknown to counterplaintiffs has maliciously, wrongfully, and unlawfully conspired and formed the deliberate design and purpose of injuring and destroying counterplaintiffs' business as aforesaid, and to cause counterplaintiffs to discontinue their aforesaid business."

They continue by alleging that in furtherance of that design and purpose John Deere has maliciously, wrongfully and unlawfully committed overt acts, to wit: Changed its pattern of extending credit to counterplaintiffs; violation of paragraph 20 of the General Agricultural Dealer's Contract (as alleged in Count One); in attempting to coerce counterplaintiffs into using John Deere's plan and method of financing; violation of paragraph 3(a) of the General Agricultural Dealer's Contract (as alleged in Count One); unreasonably refused payment for a claim for damages to tractors damaged in transit, under a policy of insurance issued to counterplaintiffs by counterdefendant; unreasonably refused to give credit for or payment of volume discounts; counterdefendant's agent and servant, R. J. Baldridge, reported goods and merchandise "out of stock" when same were actually in stock causing them to be charged for goods not actually sold; On September 25, 1961, counterdefendant's agent, R. J. Baldridge, scheduled a local John Deere Day program, and after all arrangements were made John Deere cancelled the program to the embarrassment, disgrace, humiliation and loss of business of counterplaintiffs; on December 8, 1961, another of counterdefendant's dealers came to counterplaintiff's place of business to pick up a combine but were prevented from doing so when the counterdefendant's agent, R. J. Baldridge, refused to permit the transfer and urged the other dealer to obtain the item from another of counterdefendant's dealers; At-

345

tempted to replevy the combine referred to under subparagraph 9 and continues to do so; R. J. Baldridge interfered with the conduct of counterplaintiffs' business and harassed and embarrassed counterplaintiffs before customers in their place of business; Subjected counterplaintiffs to a suit in replevin; Subjected counterplaintiffs to a wrongful suit in replevin and for injunction which hampered and harassed counterplaintiffs in the conduct of their business so that they were unable to consummate certain sales contracts requiring their customers to make purchases from dealers other than themselves; Caused counterplaintiffs' customers and merchants and residents in and about the community to believe and suspect that they are going out of business, that they are to be discontinued as John Deere dealers, are to be replaced by another dealer, and has actively solicited other person or persons to replace them as its dealer; and has directed certain of counterplaintiffs' customers to take their business to other dealers.

They conclude by alleging that as a result of the aforesaid conspiracy and pursuant to the aforesaid acts that counterplaintiffs have been irreparably injured and damaged in their business in the amount of $200,000.

Metzler Brothers and John Deere had operated under a dealership agreement for a period of 42 years. Their contract was from year to year, the last contract having been entered into on November 18, 1960, for a period to and including August 31, 1961. Delay in entering into this 1960–1961 agreement was occasioned by credit problems between Metzler Brothers and John Deere.

The arrangement between John Deere and Metzler Brothers might well be described as an exceptionally complex commercial relationship. It involved the sale of and payment for hundreds of separate items in-

346

cluding machinery, parts and attachments, as well as credits for repairs and replacements.

All items were furnished Metzler Brothers on a deferred payment basis. They were to be paid for at times provided by the terms of payment established by John Deere and in any event were due and payable immediately upon the sale of such items by Metzler Brothers, or upon their removal from Metzler Brothers' place of business, or upon personal use by Metzler Brothers.

Title to and ownership of all the goods delivered under the contract as well as used machines taken in trade by Metzler Brothers together with the proceeds of all sales due were lodged in John Deere.

All indebtedness of Metzler Brothers was considered as a lump sum indebtedness to John Deere.

Monthly inventory checks were made by agents of John Deere in verifying Metzler Brothers' report of inventory. All items accountable for by Metzler Brothers not found upon a physical check of the inventory were listed as out of stock and payment for the same due. Exceptions were made in the case of any item that was on demonstration.

John Deere's agent would also make a physical examination of alleged warranted defective parts for credit and the report of the same together with all labor charges forthcoming to Metzler Brothers. This report would be forwarded to John Deere's district office for processing and credit.

It was also customary for John Deere dealers to exchange and have transferred to and from their accounts machinery, accessories and repair parts.

The amount of the dealers indebtedness at any particular time was also affected by John Deere's financial plan, floor plan notes, transportation charges, advanced freight and handling charges, excise, sales,

use and other similar taxes payable by Metzler Brothers to John Deere.

Among the many provisions of the General Agricultural Dealer's contract between the parties the following provisions are important to the decision in this case:

Clause 2.

The terms of this contract is from the effective date hereof to August 31, 1961, both inclusive, or to any earlier date on which this contract may be terminated in accordance with its provisions or by agreement of the parties or on which a subsequent General Agricultural Dealer's Contract covering the same type of goods is entered into between the parties, and on such date or on the occurrence of any such events, the term of this contract shall be deemed to have "expired" regardless of the reason for termination. Expiration of the term of this contract shall not affect obligations of either party arising out of and pertaining to goods delivered before such expiration or termination or to any goods delivered after such expiration or termination to which the terms of this contract specifically apply, nor shall it affect the company's title and rights to all such goods under Clauses 16, 17, 18, and 30.

Clause 3.

(a) Subject to and in accordance with the provisions of this contract, the Company agrees to sell and the Dealer agrees to buy the goods handled by the Company as agricultural machinery or equipment ₀ . . .
₀ . . .

(c) The Company is under no obligation to accept orders issued by the Dealer subsequent to the expiration of the term of this contract, and the acceptance of any such orders by the Company shall in no sense be deemed a renewal or extension of the term of this contract. However, if any goods are shipped pursuant

348

to such orders they shall be governed by the provisions of this contract unless prior to the issuance of such orders a subsequent general dealer's contract covering that type of goods has been entered into between the parties.

Clause 10.

(a)   All goods are ordered hereunder at the prices and on the terms of payment provided in the Company's Agricultural Price Lists and Agricultural Terms Schedule in effect on the date ordered. If, however, any such prices or terms shall be changed prior to the shipment of goods, such order shall be deemed amended to provide for the prices and terms in effect on the date of shipment. It is understood that prices and terms, or any of them, may be changed by the Company at any time and from time to time without notice to the Dealer. . . .

Clause 13.

. . .

(b)   The Dealer shall pay the Company the invoice price of all goods promptly on the dates and at the times provided in the terms of payment established by the Company, it being understood that regardless of due dates stated in the Company's terms of payment the invoice price of all goods subject to complete machine terms is immediately due and payable upon the sale of such goods by the Dealer, or upon their removal from the Dealer's place of business, or upon personal use of such goods by the Dealer, or upon settlement being made with the Dealer by the purchaser of such goods, whichever first occurs.

Clause 16.

(a)   The title to and ownership of all goods delivered under this contract by the Company to the Dealer is and shall remain vested in the Company until full payment of the indebtedness arising under this contract and any other indebtedness now or hereafter

owing by the Dealer to the Company shall have been made to the Company, in cash or as provided in any finance plan which is in effect between the parties. Until such payment has been made, the Dealer shall not sell, mortgage, pledge or in any other way dispose or deal with any of the goods, except as permitted by paragraph (c) of this Clause 16. It is understood and agreed that all of the Dealer's indebtedness to the Company shall be considered as a lump sum indebtedness regardless of individual terms as to portions thereof and regardless of individual times of payment, and that the Company's retention of title shall apply to all goods delivered hereunder regardless of the fact that payments made on the Dealer's indebtedness may be assigned to a particular item or items of goods. The terms "full payment" and "Dealer's indebtedness" as used in this paragraph include the invoice price of the goods, plus any direct transportation charges, advanced freight or handling charges, and excise, sales, use or other similar taxes, payable hereunder by the Dealer to the Company.

. . .

(c) Sales for value received may be made to users by the Dealer in the ordinary course of retail business provided that full settlement is obtained from the purchaser at the time of sale, full payment for the goods sold is made by the Dealer to the Company in accordance with the provisions of this contract, and that pending settlement with the Company title to all proceeds of sale, regardless of the form of such proceeds, shall be in the Company and such proceeds shall be received and held by the Dealer as the Company's property in lieu of the goods so sold. Title to used machines held by the Dealer as proceeds and designated in Floor Plan Notes accepted by the Company in settlement for goods shall remain in the Company until such notes are paid. Such used machines may

350

be sold by the Dealer to users in the ordinary course of his retail business, provided that title to the proceeds of any such sales shall be in the Company and such proceeds shall be held by the Dealer in like manner and subject to the same conditions as proceeds of the sale of new goods.

. . .

Clause 17.

(a) in the event of the happening of any of the following:

(1) (i) The Dealer defaults in the payment of any obligation owing to the Company or fails to account to the Company for the proceeds of the sale of any goods which he has sold, the title to which is in the company; . . .

(2) If the Company feels itself insecure in doing business with the Dealer by reason of:

o o o

(iii) The Dealer's personal conduct or any other happening or event which in the Company's judgment may adversely affect his financial or credit position, the Company at its election may terminate this contract.

(b) Upon the happening of any of the above contingencies the Company, with or without terminating this contract, may also take any one or more of the following actions:

(i) declare immediately due and payable all indebtedness owing by the Dealer to the Company and collect the same together with court costs and reasonable attorney's fees;

(ii) discontinue or withhold the delivery of goods to the dealer, or make future deliveries only on a cash or C.O.D. basis;

(iii) take possession of any or all property, the title to which is vested in the Company.

(c) Notice of termination of this contract or of acceleration of the maturity of the Dealer's indebtedness shall be given to the Dealer in such manner and at such time as the Company may see fit. No notice of any other action taken or to be taken by the Company hereunder shall be necessary, such notice being hereby expressly waived by the Dealer.

Clause 18.

(a) In case the Company elects to take possession of any property pursuant to the provisions of Clause 17(b), it shall have the right, to the full extent allowed by law, to enter any premises occupied or under the control of the Dealer for that purpose, and after taking possession of any such property, the Company may also take any one or more of the following actions:

(1) Credit the Dealer's indebtedness with the invoice price or the Company's current wholesale price, whichever is lower, for all goods taken into possession, or any part thereof, . . . .

. . .

(c) The credit allowed to the Dealer pursuant to paragraphs (a)(1) and (2) above, after making the deductions herein provided, may be applied at the Company's discretion to any indebtedness owing by the Dealer to the Company whether arising under this contract or otherwise. If the amount to be credited exceeds such indebtedness, the surplus shall be paid to the Dealer, and if it is less than such indebtedness, then to the extent allowed by law the Dealer shall be liable for the deficit and shall promptly pay the same to the Company.

. . . . . .

Clause 24.

(a) The Company will make available to the Dealer a supply of printed order forms for his use in sell-

ing whole goods. Such order forms contain a written warranty which is applicable to new John Deere goods but which specifically excludes other categories of goods, including non-John Deere goods handled by the Company. The Company will also make available to the Dealer a Warranty Certificate suitable for his use (in appropriate cases) in connection with the sale of non-John Deere goods handled by the Company.

. . .

(c) The Dealer will be charged for all parts ordered to replace those claimed to be defective. Credit for such charge, including cost of transportation to the Dealer's place of business as hereinafter provided, will be allowed only when such parts are retained by the Dealer for inspection by the Company and when the same are determined to be actually defective by the Company, whose determination shall be binding and conclusive on all parties.

John Deere points out certain events in the course of their relationship with Metzler Brothers which prompted them not to renew the agreement upon its automatic termination on August 31, 1961, and to institute the instant proceedings.

They say that in December of 1958, another creditor of Metzler Brothers, Continental Oil Company, had placed them on a C.O.D. basis and that like action in September of 1959, in placing Metzler Brothers on a C.O.D. basis was taken by Firestone Tire and Rubber Company.

In 1958 and 1959 the Carlinville National Bank had pressed Metzler Brothers for the payment of past due promissory notes and had complained of their frequent issuance of checks against insufficient funds.

In December, 1959, John Deere had been compelled to refer Metzler Brothers' account to an attorney for collection and at that time had placed Metzler Brothers on a C.O.D. basis from which they were relieved

353

upon payment of some sixteen thousand dollars past due.

On March 6, 1961, Metzler Brothers were in arrears on payment due in the amount of $11,017.15. They had issued their check for $5,246.78 in part payment of this amount, which check had twice failed to clear their bank for want of sufficient funds. At this time they again placed Metzler Brothers on a C.O.D. basis. On July 31, 1961, when their past due account amounted to $11,874.95, their check was again returned for lack of sufficient funds, and they were again placed on a C.O.D. basis.

In February of 1962, Metzler Brothers' check in the amount of $3,530.15, issued as payment on their account was returned for lack of sufficient funds. On March 5, 1962, Metzler Brothers' account in the amount of $16,649.92 was past due, which included the $3,530.-15 check which was returned for lack of sufficient funds.

John Deere for reversal, or in the alternative for reversal and remandment for a new trial, urge:

(1) The Court should have directed a verdict on Count Two of the counterclaim in that the evidence failed to show that any tort was committed and is devoid of any showing of their having maliciously, wilfully and unlawfully conspired to injure Metzler Brothers' business and that the judgment for John Deere on Count One of the Counterclaim fully adjudicated all of the issues under Count Two of the counterclaim which were supported by any evidence; (2) The evidence does not support a finding of any damages to Metzler Brothers resulting from any of its acts; (3) The verdict is against the manifest weight of the evidence; (4) The Court erred in the giving and refusing of certain instructions; and (5) The damages awarded are excessive.

The complaint charges that John Deere, by, with and through its agents and servants, and by and with certain other persons unknown to Metzler Brothers, maliciously, wrongfully and unlawfully conspired and formed a deliberate design and purpose to injure and destroy Metzler Brothers' business.

■ We are immediately faced with the question of whether or not a conspiracy existed. We think not.

Nowhere do we find in the alleged acts of omission or commission set out in the countercomplaint any evidence in the record, to support a finding that John Deere and certain other persons unknown, by word or act, combined to injure or destroy Metzler Brothers' business. All of the alleged acts complained of were those of John Deere and its agents or servants.

■ ■ The acts of an agent are considered in law to be those of the principal. Thus a conspiracy does not exist between a principal and agent. (Poller v. Columbia Broadcasting System, Inc., 284 F2d 599, and Newman v. Bastion-Blessing Co., 70 F Supp 447.)

It is only when the conspiracy itself is the gist of the offense that proof of such a combination alone is in itself actionable. (Franklin Union No. 4 v. People, 220 Ill 355, 77 NE 176, and People v. Bain, 359 Ill 455, 195 NE 42.)

■ Quite to the contrary are actions based upon a civil conspiracy. In civil cases the gravamen is not the conspiracy or combination but the unlawful acts committed in pursuance to the conspiracy or civil wrong resulting in damages. (Seno v. Franke, 16 Ill App2d 39, 147 NE2d 469, and Ammons v. Jet Credit Sales, Inc., 34 Ill App2d 456, 181 NE2d 601.)

■ However when a tort is committed and damages result therefrom, the allegation that it was carried out by several pursuant to a conspiracy does not so change the nature of the action, that if wrongful

acts are shown to have been committed by one individual only it cannot be maintained against him alone and other defendants exonerated.

It was said Hyman v. Burmeister, 216 Ill App 98, "If a plaintiff fail in the proof of a conspiracy or concerted design, he may yet recover damages against such of the defendants as are shown to be guilty of a tort, resulting in damages to him. The charge of conspiracy, where unsupported by the evidence, will be considered mere surplusage, not necessary to be proved to support the action. 8 CYC 647; Doremus v. Hennessy, 62 Ill App 391; Martin v. Leslie, 93 Ill App 44."

"The common law seeks to protect every person against the wrongful acts of others, whether committed alone or by combination, and an action may be had for injuries done which cause another loss in the enjoyment of any right or privilege or property. No persons, individually or by combination, have the right to directly or indirectly interfere or disturb another in his lawful business or occupation, or to threaten to do so, for the sake of compelling him to do some act which, in his judgment, his own interest does not require. Losses wilfully caused by another, from motives of malice, to one who seeks to exercise and enjoy the fruits and advantages of his own enterprise, industry, skill and credit, will sustain an action. . . ."

"Malice, as here used, does not merely mean an intent to harm, but means an intent to do a *wrongful harm* and injury." (Emphasis supplied.) Doremus v. Hennessy, 176 Ill 608, 52 NE 924 and 54 NE 524.

Thus we conclude that if the acts of John Deere were tortious in that they consisted of a design and purpose to intentionally do a wrongful harm and injury resulting in fact in an injury they are actionable without proof of a conspiracy so to do.

356

In view of the foregoing we must now review the alleged acts complained of and determine if they support a judgment on the verdict for Metzler Brothers. In this regard we have examined the entire report of proceedings, which consists of over fifteen hundred pages of testimony and exhibits.

Metzler Brothers in their brief and argument set out some fifty-four references to the evidence which they argue support their verdict and judgment under Count Two of the countercomplaint.

We believe it to be a fair statement to say that these evidentiary facts constitute all of the evidence in this voluminous record that is in any way germane to our consideration of the verdict and judgment under Count Two of the countercomplaint.

■ It is elementary that recovery can only be had based upon the charges of omission or commission charged in the complaint. (Bennett v. Illinois Power and Light Corp., 355 Ill 564, 189 NE 899.)

Metzler Brothers evidentiary suggestions as tending to support their verdict that John Deere failed to take an inventory in February, 1962, and started preparation for its replevin action before March 5, 1962; shipped cartons for the purpose of packing parts and attachments and charged Metzler Brothers' account for them without giving notice; failed to give credit for excise taxes and other taxes on returned goods; failed to give credit for claims existing prior to March 5, 1962, until March 27, 1963; retained security interest by their unilateral contract in all goods of Metzler Brothers while in their possession and paid for; refused to check or approve claims for labor; consulted with employees rather than counterplaintiffs to their discredit in the eyes of their employees; failed to restore items to inventory; caused employees to quit with rumors that they were going out of business; refused to

357

make allowances that were made to other dealers; caused Robert Metzler to lose interest in the implement business; and caused their employees to quit and go with Fred Smith, the new John Deere dealer, will not support recovery in that such acts are not supported by any alleged wrongful acts charged in the counter-complaint.

The verdict and final judgment in favor of John Deere under Count One of the counterclaim would preclude any recovery by Metzler Brothers under Count Two based upon allegations that John Deere refused to inspect defective parts for credit as provided in paragraph 24 of the agreement, failed and refused to carry out its agreement to sell goods handled as provided by paragraph 3(a) of the agreement; advising Metzler Brothers not to go to Moline for parts and refusing them parts; making it useless to try to obtain parts; and forcing Metzler Brothers to get parts from other dealers at additional cost. Such alleged acts and any evidence tending to support them would be inconsistent with John Deere's favorable verdict under Count One of the counterclaim. (People v. Swan, 382 Ill 184, 46 NE2d 1003; Leopold v. City of Chicago, 150 Ill 568, 37 NE 892; Inter Ins. Exchange of Chicago Motor Club v. Andersen, 331 Ill App 250, 73 NE2d 12; Kelly v. Powers, 303 Ill App 198, 25 NE2d 125; Hardy v. Bankers Life & Cas. Co., 19 Ill App2d 75, 153 NE2d 269.)

Several specifications of acts relating to the issuance of the writ of replevin are suggested as acts constituting an intent to do a wrongful harm and injury.

It is said that John Deere filed a replevin action for items that were paid for, threatened and proposed that they would sell out Metzler Brothers under their replevin action, prevented sale of merchandise on hand by their replevin action, caused loss of sales of merchandise, filed replevin action on machinery they had

358

prohibited Metzler Brothers from transferring, and refused to take items listed in the replevin action.

Prior to the trial of the issues Metzler Brothers made an unconditional tender of many of the items sought by John Deere by their action in replevin. By having so tendered items, the subject of the replevin action, they have confessed in open court that John Deere had a rightful cause of action to the amount tendered.

They have thus admitted every fact which John Deere would be required to prove to entitle it to the items so tendered. (Mason v. Uedelhofen, 102 Ill App 116, affirmed, Uedelhofen v. Mason, 201 Ill 465, 66 NE 364; Price v. Jester, 137 Ill App 565.)

Having admitted the propriety of John Deere's replevin action it cannot be said that the action and proceedings therein were wilfully caused from motives of malice with intent to do a wrongful harm.

Metzler Brothers have in no way suggested that they were not in default on their account on March 5, 1962, the date of the filing of the action in replevin.

Metzler Brothers further suggest as evidence of tortious conduct on the part of John Deere the issuance of a temporary injunction without notice and without bond in aid of its replevin action.

The temporary injunction restraining Metzler Brothers from selling, conveying, pledging, transferring, mortgaging or encumbering any real or personal property of theirs until the further order of the court was issued on March 5, 1962, upon the filing of the replevin suit and the plaintiff's replevin bond in the amount of $147,000.

On Metzler Brothers' motion alleging inter alia that Metzler Brothers had provided a forthcoming bond and that the same affords adequate protection to John Deere in their replevin action, the temporary injunction was dissolved on March 8, 1962.

359

■ An injunction is not the act of the party applying for it but the act of the Court. It issues because the Court is of the opinion it ought to issue and so orders. No wrong is committed by the applicant, although it be dissolved, unless he was acting maliciously and without probable cause. (Chicago Title and Trust Co. v. City of Chicago, 110 Ill App 395.)

■ Where no bond is required by the statute on injunctions it is within the discretion of the court to allow its issuance without the filing of a bond. (Mitchell v. Mitchell, 10 Ill App2d 437, 135 NE2d 109.)

No offer was made to show the elements of malice and want of probable cause in John Deere's application for temporary injunction in aid of their action in replevin which was admittedly a proper and legitimate cause of action by Metzler Brothers' admission by tender in the replevin action.

A series of acts commencing on February 16, 1961, by R. J. Baldridge, who on that date became territory manager for John Deere, are pointed up as being motivated by John Deere.

They say that Baldridge reported items out of stock that were not actually out of stock, for which Metzler Brothers were charged; refused to check with Metzler Brothers on out of stock reports; reported items out of stock without discussing their whereabouts with Metzler Brothers; and made false reports as to items without discussing report with Metzler Brothers.

Franklin Metzler testified that on occasions he was consulted about the out of stock reports and that Baldridge always conferred with an employee about the items when Metzler was not present.

The record further shows that any errors in the taking of the out of stock report were ultimately corrected. Considering the complex business arrangement between the parties, the hundreds of items involved, and the fact that items of equipment were at

360

times on demonstration, the errors complained of would not strike one as out of the ordinary. In addition any errors of accounting were rectified under John Deere's action for moneys due from Metzler Brothers.

They further point out that Baldridge told them that payment for goods sold must be forthcoming on the date of sale and that he had made a demand for payment on April 3, 1961, when it was customary to make settlement on April 10. These requests were all in accordance with the terms of payment provided under Clause 13 of their contract.

Metzler Brothers, to sustain their judgment, point out several instances wherein they were placed on a C. O. D. credit basis, Such action was warranted under the terms of Clause 17 of the contract when Metzler Brothers were in default of payment of any obligation owing John Deere.

The record clearly demonstrates that in every instance in which Metzler Brothers were placed upon a C. O. D. credit standing that the amount of arrearage of their account with John Deere exceeded the aggregate of any amounts in dispute or errors in accounting.

We now turn our attention to certain other suggestions by Metzler Brothers which they state substantiate the allegations of their counterclaim.

They say volume discounts were not afforded them until January of 1962, whereas they should have been made on October 31, 1960; volume discounts were to be based on purchases made during a "volume discount year" ending on September 23, 1961, on condition that all of the dealer's obligations were current on that date. Metzler Brothers' account was not current on that date nor was it so contended. This discount in the amount of $8,771.91, even though not earned, was credited to Metzler Brothers' account in January, 1962, in an effort to assist them in making their account more current.

361

They state that John Deere changed their manner of operation after Baldridge replaced John Majors as territory manager. The evidence in this regard was a dissertation on the manner in which Baldridge's predecessor, Major, handled the business as a territory manager. It in nowise demonstrates any action on the part of Baldridge contrary to the contract provisions.

They contend John Deere defeated a transfer of a combine for one Strang by calling a John Deere dealer in Edwardsville. Nowhere does the record support this assertion.

They say John Deere tried to force Metzler Brothers to use the John Deere credit plan. The evidence in this regard relates that a Mr. Rake suggested to Metzler Brothers that if the plan was used Metzler Brothers would have their problems cut down and afford them necessary working capital. That the program was proposed to all John Deere dealers.

Metzler Brothers contend that John Deere delayed an insurance settlement for about eight months in December of 1959, and used it as a reason to place Metzler Brothers on C. O. D. In this instance credit for the amount of repairs in the amount of $1,082 was withheld from Metzler Brothers' account until settlement was made by the wrongdoer's insurance company.

They complained of threatening telephone calls from John Deere employees. Mr. Rake, by telephone, on one occasion suggested that if they did not make a payment they would be compelled to take some action.

It is said that after March 3, 1962, John Deere caused other dealers to refuse to sell parts to Metzler Brothers. This allegation is based upon incompetent evidence to the effect that it was learned from an unidentified telephone caller that the dealer at Assumption had orders from John Deere not to furnish

362

Metzler Brothers with any parts in the future. This evidence was admitted over objection and motion to strike answer.

Metzler Brothers claim that John Deere directed Metzler Brothers' customers to go to other dealers for warranty work. The evidence in this respect was that a customer· was told to first go to Metzler Brothers, and if they did not have the parts to go to another dealer.

It was claimed that John Deere caused regular customers of Metzler Brothers to go to other dealers for equipment. The evidence here referred to does not support such an allegation but consisted solely of a list of prospective customers of Metzler Brothers.

They say John Deere made Fred Smith the franchise dealer in Carlinville, Illinois, without notifying them that their contract was cancelled. The evidence discloses that Fred Smith became the franchise dealer following the termination of the contract between John Deere and Metzler Brothers on August 31, 1961.

They complain John Deere through the Carlinville National Bank caused trouble for them with Continental Oil Company. On this occasion Continental Oil Company placed Metzler Brothers on a C. O. D. basis, their account being seven thousand Dollars past due. In addition this complained of act is outside the scope of any charges of commission charged in the complaint.

Metzler Brothers urged that John Deere caused run to be made against Frank Metzler by the Carlinville National Bank. This allegation is supported by no evidence in the record. This complained of act is also outside the scope of the pleadings.

It is asserted that John Deere gave bad references upon inquiry being made by Continental Oil Company. At that time Metzler Brothers had issued a check to Continental Oil Company in the amount of $2,619.91, which was returned unpaid. Metzler testified that Con-

tinental Oil Company's credit manager, L. J. Fanning, said that John Deere was responsible for Continental Oil Company's action. This statement was categorically denied by Fanning, and outside the scope of the pleadings.

Metzler Brothers claim that John Deere failed to hold a John Deere Day in 1962 and failed to send supplies after Metzler Brothers had secured the building for holding the John Deere Day. The John Deere Day was to be held on February 2, 1962, at a time when the contract was no longer in force and John Deere was preparing its accounts for action in replevin.

In characterizing the acts of John Deere complained of, we shall not again reiterate the evidence. No useful purpose would attain in so doing in an already too long opinion.

■■■ Viewing the relationship of the parties as a composite picture the actions of John Deere were those rightfully belonging to a secured creditor in the course of commerce, as well as being authorized by the general Agricultural Dealer's agreement in most instances. They were in nowise out of the ordinary under the circumstances as to indicate an intent to do a wrongful harm and injury. To say that such acts constituted an actionable tort would place an undue restraint upon a creditor in a commercial enterprise.

It was said in Martin v. Summers, 79 Ill App 392, "We think, however, that law and justice require us to hold that the appellees, having the legal authority expressly given them by the appellant, in the power of attorney, to have the judgment entered when it was entered, can not be held by the appellant liable to the effect of the entry of such judgment, merely because the motives prompting them to do so were malicious; for the courts will not inquire into the motives actuating a person in the performance of a legal right. Phelps v. Nowlen, 72 NY 39. Judge Cooley, in his admirable work on 'Torts', on page 699, says that 'the ex-

ercise by one man of his legal right can not be a legal wrong to another. . . . Any transaction which would be lawful and proper if the parties were friends, can not be made the foundation of an action merely because they happen to be enemies. As long as a man keeps himself within the law, by doing no act which violates it, we must leave his motives to him who searches the heart. To state the point in a few words, whatever one has a right to do, another can have no right to complain of.' "

"Again at page 690, he says: 'Bad motive, by itself, then, is no tort. Malicious motives make a bad act worse, but they can not make that a wrong which in its essence is lawful. When in legal pleadings the defendant is charged with having wrongfully and unlawfully done the act complained of, the words are only words of vituperation, and amount to nothing unless a cause of action is otherwise alleged.' "

The Court, in Winters v. University Dist. Bldg. & Loan Ass'n, 268 Ill App 147, said: "The 'gist' of all these cases is that defendant in error has the right to look after all of its interests in the property in question and protect its rights wilfully and conclusively, and if defendant in error, while engaged lawfully and legally within its legal rights, even with malice interferes with the contracts and combinations of others, it is not actionable."

". . . . One may sue his debtor from no motive but ill-will, and yet if there is a legal cause of action there could be no liability for bringing the suit. It will be manifest from these examples that immunity from liability for the exercise of a legal right does not rest alone upon the right of competition in trade, but is founded upon the truism 'that the exercise by one man of his legal right cannot be a legal wrong to another.' (Cooley on Torts, 688.) To justify a recovery there must be a legal wrong as well as damage."

Metzler Brothers cite two cases to support their theory that the evidence in the instant case demonstrates an intent to injure and destroy their business, namely, American Bank and Trust v. Federal Reserve Bank, 256 US 350, and Stilliman v. Dobmer, 165 Minn 87, 205 NW 696.

We have examined these cases and find no similarity to the instant case. As stated by Metzler Brothers in their brief, the former case stands for the principle that a person may be liable for accumulating checks drawn on the plaintiff and presenting them all at once for payment, and in the latter case the purchase of notes and transferring of them to a bona fide purchaser who may immediately enforce them, is actionable.

Both cases hinge upon the theory that the action by the alleged tort feasor was solely activated by motives to ruin the plaintiff financially.

Metzler Brothers have again questioned the jurisdiction of this court for violation of Rule 1 of the Uniform Illinois Appellate Court Rules and have asked that this appeal be dismissed. This court has on at least three occasions denied like motions. We find nothing further compelling to reverse our prior orders in this regard.

In view of the foregoing it will not be necessary to consider the other errors urged by John Deere relating to instructions and excessive damages.

The judgment of the Circuit Court of Macoupin County is reversed and judgment for counterdefendant, John Deere, entered here.

Reversed with judgment here.

CROW, P. J. and ROETH, J., concur.