431 S.W.2d 728 (1968)
FIREMEN'S INSURANCE CO. OF NEWARK, NEW JERSEY, Appellant,
v.
Elston JONES et al., Appellees.
No. 5-4489.
Supreme Court of Arkansas.
September 16, 1968.
Rehearing Denied October 14, 1968.
*729 McMillen, Teague, Bramhall & Davis, Little Rock, for appellant.
Bernard Whetstone, Little Rock, and James E. Stein, El Dorado, for appellees.
BYRD, Justice.
This action was tried upon the theory that the Louisiana tort-feasor's liability insurance carrier through fraud and deceit lulled the injured parties into a sense of security until Louisiana's one-year prescription ran on their claims. The carrier, Firemen's Insurance Company of Newark, New Jersey, appeals from jury verdicts awarding Mrs. Zelma Jones $15,000; her daughter, Paula Jones, $1,000; her husband, Elston Jones, $1,000; and her brother, Jerry Ezell, $5,000. Elston Jones cross appeals on the basis that the $1,000 verdict in his favor is inadequate. Leo Ezell, father of Jerry Ezell, cross appeals, urging that the court erred in failing to enter judgment in his favor for the amount of the jury's corrected verdict.
The record shows that Mrs. Jones had not more than an eighth-grade education and that her parents, Mr. and Mrs. Leo Ezell, had even less education. Mrs. Jones was married at the age of fourteen and had two daughters. The older daughter, Paula, had scoliosis and was being treated by a specialist in Houston.
On July 22, 1965, Mrs. Jones, Paula and Mrs. Jones' brother, Jerry Ezell, were on their way to Huston to have Paula's brace adjusted. While stopped at a traffic light in Shreveport, Louisiana, their automobile was hit from the rear by Edgar F. Kemp. Kemp admits having imbibed some alcoholic beverages prior to the collision. The investigating police officer testified Kemp had been drinking. Kemp pleaded guilty to a charge of reckless driving. Mrs. Jones described him as being drunk. Kemp admitted liability to both Mrs. Jones and the investigating officer.
Mrs. Jones, her daughter and her brother all received hospital treatment in Shreveport. Mrs. Jones was later transferred by ambulance to a hospital in El Dorado, Arkansas. She was in the hospital again in September, October, February, March, May and July for treatment related to her July 22, 1965 injuries, according to Dr. Moore, her treating doctor.
Mrs. Jones says that while in the Shreveport hospital she was called by Mr. Maddox, one of appellant's adjusters, who suggested that she should get any kind of medical *730 care she needed and assured her that her bills would be taken care of.
About August 17, 1965, Mr. Williams, an employee of Chambers Claim Service, took a written statement from Mrs. Jones in the presence of her husband and her mother. Mrs. Jones testified that she also signed medical authorizations at that time for all the doctors except Dr. Moore and that she delivered one to Dr. Moore. Williams denies that the medical authorizations were signed.
The Joneses say that during Williams' visit Mrs. Jones got to talking about the medical expenses and went to crying. Williams went over to Mrs. Jones and told her to brace up, that she knew he was going to take care of her and to let him worry about it. She had been in and out of the hospital so much that it was too early in the day to evaluate the claim, and as quick as her condition permitted they would make as early a settlement as possible. They say Williams told Mrs. Jones that with the type of injury she had it would take a year to evaluate the claim. Mrs. Jones had known Williams when he worked on the El Dorado police force.
Mr. Jones testified that when Williams asked him if he had contacted an attorney, he replied that he had only talked to Mr. Walter Brown on the telephone one time; that Williams said they didn't need a lawyer; that he was going to take care of them; and that the Joneses only had to submit a price and Williams would take care of the rest of it.
After taking the statement from Mrs. Jones, Williams called her three or four times and Mrs. Jones called him three or four times. Her testimony is that when she would try to rush Williams up, he would tell her that they couldn't file a claim for a year and that they had to wait a year and a day from the accident date to submit one figure to the company. The last telephone call from Williams came about two weeks before July 18, 1966, when he called to say he was going on a vacation shortly and would be passing through Little Rock, and if the Joneses could come up with a figure he would be glad to submit it to the insurance company as he went through Little Rock and perhaps he would have something for them when he came back, which would be two or three days after July 22.
About two weeks before July 22, 1966, Mrs. Jones, who acted somewhat as spokesman for all the parties took the accumulated medical bills to Chambers Claim Service and matched them to see that Chambers Claim Service had all the bills that she had. According to Mrs. Jones, she and Mr. Whatley, a partner in Chambers Claim Service, didn't have a whole lot of conversation, but when she left she thanked him for the kindness Williams had shown them in handling the claim, said that the year was almost up and they had survived it and appreciated what Williams had done. Whatley made no comment.
On July 18, 1966, before the running of the one-year prescription on July 22, Mr. Jones notified Mr. Chambers, the other partner in Chambers Claim Service, that they were ready to submit a figure. Chambers stated that he was tied up but would get out as soon as possiblemaybe the next day. When Chambers did not contact the Joneses as promised, they called Chambers Claim Service several times without being able to reach anyone, but each time left their name and phone number. Their next contact from Chambers Claim Service was a letter dated August 22, 1966, stating that the insurance company had instructed them to close their file as there was no further need for their services. Upon telephone inquiry to Chambers Claim Service, Mrs. Jones was informed that this was the first time a file had ever been pulled from them in this manner and that they did not know what was wrong or why it had been done.
After some difficulty Mrs. Jones reached Mr. Foster, the claims manager for Firemen's in Shreveport, and asked for an explanation *731 of Chambers Claim Service's letter of August 22. She informed him that she had promised to call Chambers Claim Service back and tell them why the file had been pulled out of their hands. She says that at this point Mr. Foster laughed and said she needn't worry about calling Chambers Claim Service back, that they were instructed from the beginning and well knew what to do with that claim from the beginning up to the point of writing the letter, that the time had expired, and that the file had been forwarded to Dallas and was closed and forever void. This was the first time the Joneses and Ezells knew that the statute of limitations in Louisiana was one year. (Arkansas has a three-year statute.)
Much of the foregoing testimony was disputed by witnesses for Firemen's.
Firemen's file shows that it had reminded Chambers Claim Service of the one-year prescription in Louisiana as early as February 1966. Both Whatley and Foster admit they knew the one-year statute was going to run within two weeks from the time Mrs. Jones went to Chambers Claim Service to match up the bills. Some time in June or July Foster had talked to Whatley about the prescriptive period. His inquiry was to see, if the twelve months did go by, that their skirts were clean so they could not be accused of having led the Joneses astray. Although he says he cautioned Whatley to be careful from this point on, he subsequently corrected his testimony to say that the call was made on July 22, 1966, for the purpose of informing Chambers Claim Service that the prescriptive period had run. Mr. Foster admitted that he had the authority to waive the one-year prescription (claim), but that he was asserting that this claim was barred by prescription in Louisiana. Kemp said that the carrier got over to him the point that he could still be sued in Arkansas for two more years but not in Louisiana.
In the action against appellant, appellees joined as parties defendant the adjuster Tom Williams, and J. M. Chambers and H. R. Whatley, partners doing business as Chambers Claim Service. In the same complaint, appellees alleged a cause of action against W. R. Brown, an attorney, on the theory of malfeasance. The jury returned a verdict only against Firemen's as above stated.
Firemen's first ground for reversal is that the court erred in failing to grant its motion to dismiss at the conclusion of plaintiff's testimony, for the reason that fraud can not be predicated on misrepresentations as to matters of law nor on opinions on questions of law based on facts known to both parties, especially when the representations are made by the avowed agent of the adverse interests.
We disagree with appellant's contention because we understand a representation as to the law of a foreign state to be a question of fact rather than of law. See Annot., 24 A.L.R.2d 1039 (1952), Restatement, Torts, § 545(2), Comment (e). Furthermore, under the fact situation here recited, we find no direct misrepresentation of the law of the state of Louisiana. Actually, the gravamen of the offense is the agent's promising to settle with appellee and advising her to wait a year to evaluate her claims. She was therefore lulled into a sense of security in the state of Arkansas while remaining ignorant of Louisiana's one-year prescription. This conduct concealed from the Joneses the fact that their claim would be barred before they knew the extent of their injuries.
Firemen's second point is that it was entitled to a directed verdict because no proof was offered of conspiracy between Chambers Claim Service or their employee Williams and Firemen's. But here again Firemen's overlooks appellees' complaint, which alleged fraud or conspiracy to commit fraud. We have consistently held that in actions against joint tort-feasors where a joint relationship is alleged, there may be a recovery against all of the defendants or against any one of them if *732 the proof warrants a finding of his participation in the tort. Patterson v. Risher, 143 Ark. 376, 221 S.W. 468 (1920). In this case appellees were not damaged by the alleged fraud until Firemen's, which had the option either to plead or to waive the one-year prescription, closed its file in reliance on the bar of the prescription.
The third point for reversal is that Firemen's was entitled to a directed verdict because no testimony was introduced as to the value of appellees' claim against Kemp in Louisiana. This alleged error is not supported by the record. There was both lay testimony and testimony of Dr. Moore about appellees' injuries. Based upon this testimony the trial court instructed the jury in detail about the damages appellees would have been entitled to recover in a direct action against Kemp, and about the burden of proof and the defenses available. Firemen's, by failing to argue any objections to the instructions, has waived any error in connection therewith.
Firemen's cites no authority for its argument that only expert testimony could be received to show the present value of appellees' claim against Kemp in Louisiana. We seriously doubt that such a rule prevails, but at any rate we must hold the contention without merit. In this instance appellees showed the same damages they would have proved had the case been tried in Louisiana, and under Ark.Stat.Ann. § 27-2504 (Supp.1967) Firemen's was entitled to and did have the matter submitted to the jury under the law of Louisiana.
Under the fourth allegation of error, Firemen's makes the inconsistent and contradictory argument that appellees failed to prove the basic allegation in their complaint that they lost their cause of action in Louisiana by reason of prescription. It is difficult to understand how one can make this argument while denying liability to appellees because the one-year prescription has run and while their claims agent, who has authority to plead or waive the statute, testifies that the action is barred by Louisiana law. Notwithstanding the inconsistent positions we find that the claim is barred under Louisiana's one-year prescription. Green v. Grain Dealers Mutual Ins. Co., 144 So.2d 685 (La.App. 1962) and Craig v. Montelepre Realty Co., 202 So.2d 432 (La.App.1967).
In the Green case, Mrs. Green alleged that while riding in a vehicle driven by her husband in Louisiana, the vehicle was struck from the rear by Mrs. Richaud. Mrs. Green, a resident of Texas, returned to her home state, where she was contacted by Crawford & Company on behalf of Grain Dealers Mutual, the liability insurer of Mrs. Richaud. Crawford & Company agents on numerous occasions advised Mrs. Green that there was no need to obtain legal assistance in asserting her claims; that she would be paid for her damages by the insurance company and would not be prejudiced by continuing to negotiate; and that she had two full years in which to file suit. Mrs. Green was ignorant of the one-year prescription statute. In denying recovery the Louisiana court pointed out that it only gave relief against the running of the prescription law to prevent the injustice of an innocent party being lulled into inaction in the enforcement of a claim by reason of defendant's concealment or fraudulent conduct, or of defendant's failure to perform a legal duty, causing plaintiff to be kept in ignorance of his rights. It then pointed out that the alleged representation that Mrs. Green had two years in which to bring her cause of action was but a misrepresentation of law and not of fact, and that under Louisiana law no one can allege ignorance of the law to prevent the running of a prescriptive right. In denying recovery the court pointed up two other grounds, one that the adjuster was under no duty to advise Mrs. Green correctly on the Louisiana law of prescription, and the other that Mrs. Green had an opportunity equal to that of the adjuster to learn the Louisiana law concerning the one-year prescription *733 in tort cases. In doing so the court recognized that other jurisdictions would permit recovery for Mrs. Green.
In the Craig case, Mrs. Craig proved damages to her dwelling from the use of both a pile driver and other heavy equipment in the construction of a hospital on adjacent land. After the pile driving had begun Mr. Montelepre assured Mrs. Craig that adjustment of damages would be made toward the end of the construction, and on occasion sent workmen to repair some of the damages when they occurred. The pile driving activity ceased on April 10, 1963 and suit was not filed until April 17, 1964. However, construction of the hospital was continuing. The trial court charged the jury as follows:
"You are charged that when a party lulls another into the belief that he will suffer no loss by his inaction, and thus induces him to refrain from claiming a debt, prescription will not begin to run until the party is undeceived."
The court on appeal disallowed Mrs. Craig's claim for the pile driving damages and in so doing said:
"If the jury found that the plaintiff was lulled into inaction by the assurances of Mr. Montelepre in response to the corresponding charge, and was thus entitled to damages which would otherwise be prescribed, then such a finding would be manifestly erroneous since the evidence adduced could in no wise indicate acts lulling the plaintiff into inaction so as to prevent the running of prescription. The acts of the defendant alleged to mislead the plaintiff must be such as to prevent him from knowing of his cause of action or must import of deliberate concealment, or fraud, or failure to perform a legal duty."
Firemen's fifth alleged error is that it was entitled to judgment notwithstanding the verdict because: (1) under the doctrine of respondeat superior the jury, by exonerating the adjusters, exonerated Firemen's as their principal, since Firemen's could act only through agents; (2) under the theory of conspiracy the exoneration of the co-conspirators exonerated Firemen's; and (3) a corporation standing alone cannot be guilty of conspiracy when the alleged co-conspirators have been exonerated.
We find appellant's contentions under the fifth allegation to be without merit first, because the complaint obviously alleges joint and several liability on the part of Firemen's, Chambers Claim Service and Tom Williams, and not necessarily on the doctrine of respondeat superior; second, because the proof shows that Firemen's also acted through an adjuster named Maddox and its claim manager, Foster; and third, because the fraud was not complete until Foster exercised his discretionary authority to rely upon the one-year prescription. Thus obviously some of the conduct was performed by persons other than Chambers Claim Service and its agents and subsequent to their actions.
It was pointed out in John Deere Co. v. Metzler, 51 Ill.App.2d 340, 201 N.E.2d 478 (1964):
"It was said in Hyman v. Burmeister, 216 Ill.App. 98, `If a plaintiff fail in the proof of a conspiracy or concerted design, he may yet recover damages against such of the defendants as are shown to be guilty of a tort, resulting in damages to him. The charge of conspiracy, where unsupported by the evidence, will be considered mere surplusage, not necessary to be proved to support the action.'"
To the same effect see Patterson v. Risher, supra.
The cross appeal of Leo R. Ezell, personally and individually in his own right, arises in this manner: Proof of medical bills for Jerry Ezell was put into evidence by stipulation, agreeing that the medical expenses had been incurred but without an agreement that they were incurred as a result of the injuries received in the accident. The form of the verdict submitted to the *734 jury left it to the jury to find generally for appellees and then had individual interrogatories as to the damages of each claimant. When the verdict was returned the jury had found damages for all claimants except Mr. Ezell. As to him, the verdict was left blank. The foreman explained to the court that nine of the jurors had found no damages in favor of Mr. Ezell and told the court that if it preferred the word "none" it could be so written. Thereupon the word "none" was inserted and the verdict was signed by nine of the jurors. The court explained to the jurors that this trial had extended over a week and that, should the Supreme Court determine that it should have sent the jury back out to determine the damages because the verdicts were inconsistent, it would be a rather expensive trial and a waste of a lot of time. To avoid such expense, the court again instructed the jury on the damages Mr. Ezell would be entitled to receive and sent them back out to reconsider the matter. The jury this time returned a verdict for $2,000. In drawing the judgment the trial court gave Mr. Ezell only his cost money.
Mr. Ezell here argues that the court, in sending the jury out for the second verdict, must have been acting under Ark.Stat.Ann. § 27-1741.3 (Repl.1962) and that having exercised the discretion to send the jury back out, it must enter a verdict for the amount found. With this contention we do not agree, because as we read the court's comment it sent the jury out the second time only to avoid the cost of a new trial should this court rule that it abused its discretion in not sending them out. In other words, as we understand the court's action, it did not determine that the first verdict was inconsistent with the evidence but was merely trying to avoid the cost of a new trial should its judgment prove erroneous.
While the record shows that Mr. Ezell incurred medical expenses upwards of $2,000, there was a clear dispute as to whether they were incurred as a result of the accident. We can not say that the first verdict was not supported by substantial evidence.
Appellee Elston Jones alleges error of the trial court in failing to enter judgment notwithstanding the verdict for medical bills incurred by him for his wife in the sum of $4,317.47 and for his daughter in the sum of $560.70. Here again the amount of the medical bills was stipulated but without agreement that they resulted from the collision. Under our decisions, Fulbright v. Phipps, 176 Ark. 356, 3 S.W.2d 49 (1928), there was substantial evidence to support the finding of the jury and we can not say the trial court's action in entering judgment for the amount of the jury's verdict was erroneous.
Affirmed.
BROWN and JONES, JJ., dissent.
JONES, Justice (dissenting).
I do not agree with the majority opinion in this case. The statutory prescription period for bringing actions for personal injuries is one year in Louisiana. One year has expired since the collision, out of which this cause of action arose, and no suit has ever been filed by any of the appellees in Louisiana. Instead of filing their suits in Louisiana where the accident occurred and the defendant tort-feasor lived and could be served with process, the appellees brought suit in Arkansas and recovered judgments for damage against the liability insurance carrier of the Louisiana tort feasor for fraudulently causing appellees to forego the filing of a suit in Louisiana within the prescription period of one year. All of the alleged statements and acts constituting the gravamen of the alleged fraud were directed toward the appellee Mrs. Jones, but judgments were awarded to all four of the appellees.
I find no evidence in the record that appellees' causes of action in Louisiana has *735 expired in the light of the fraud alleged by appellees. I am unwilling to say that an insurance adjuster's authority to waive the statute of limitations in the settlement of claims, and his election not to do so, amount to a judicial determination that a cause of action has been lost by prescription, in Louisiana or any other state, where it is provided by statute or otherwise, that the statutory period of prescription may be suspended or tolled by actionable fraud.
Consequently, I am unwilling to assume, as I feel the majority was required to do in affirming this case, that appellees had lost their cause of action in Louisiana at the time this suit was filed in Arkansas.
There are 116 pages of the Louisiana Code devoted to causes which interrupt and suspend prescription in that state. (West's L.S.A. Civil Code, pages 259-375). The plea of prescription in Louisiana, like the plea of limitations in Arkansas, is a matter of defense to be affirmatively pleaded by the defendant. By legislative enactment, courts cannot supply the plea of prescription in Louisiana, L.S.A. Civil Code, Art. 3473. In Louisiana, prescription is a "special defense" that must be pleaded, and if a complaint states a cause of action jusifying relief and the prescriptive plea is not made, the court cannot supply it, but must give judgment for the plaintiff if the demand is otherwise established. Sirmon v. Cron & Gracey Drilling Corporation, 5 Cir., 44 F.Supp. 29. Delay does not affect plaintiff's cause of action in Louisiana, where the defendant does not plead prescription. Sporl v. New York Indemnity Co., 176 La. 363, 145 So. 771. In Louisiana the plea of prescription is personal to the defendant and discretionary with it. United States v. Mercantile Nat. Bank at Dallas, D.C., 67 F.Supp. 759.
The rule "contra non valentem agere nulla currit praescripto" is also applied in the state of Louisiana to prevent the injustice of an innocent plaintiff being lulled into a course of inaction in the enforcement of his right by reason of concealment or fraudulent conduct by the defendant, or because of his failure to perform a legal duty whereby plaintiff has been kept in ignorance of his rights. Kennard v. Yazoo & M. V. R. Co., La.App., 190 So. 188.
As I view this case, it was submitted to the jury on hearsay evidence and the assumption that Edgar F. Kemp, the Louisiana tort-feasor, would have had no defense, even in mitigation of damages, under the Louisiana law if the suit had been filed and tried in that state. Aside from Mrs. Jones' own testimony, I find no evidence of actionable fraud in this case. The dramatic nature of Mrs. Jones' testimony adds nothing to its quality as substantial evidence in my opinion.
Mrs. Jones testified that she had observed Kemp driving out from a beer tavern and following her automobile; that he was lying over on the steering wheel and was weaving his automobile from side to side while driving behind her; that she had been stopped for the traffic light a few seconds when Kemp ran into the rear of her automobile, knocking it through the intersection and to the second parking meter beyond the intersection; that her neck was injured to the extent that she was unable to hold her head up; that when she got out of her automobile, it was necessary for her to take hold of her hair with one hand in order to hold her head up while talking with Kemp; that Kemp admitted that the accident was all his fault, that he had $100,000 insurance on his automobile, and that she had nothing to worry about. She testified that Kemp was obviously drunk; that he fell to one knee and then to the other knee and finally had to pull himself up and brace himself against an automobile while talking to her. She testified that she "passed out" soon after a traffic officer arrived; that she was taken to a hospital in Shreveport where Mr. H. G. Maddox, a claims representative for Kemp's liability insurance carrier, Firemen's Insurance Company, called on her and advised her not to worry about anything, to make all the long distance telephone calls necessary *736 and that the company would assume full responsibility for all necessary bills.
The fraud Mrs. Jones complains of primarily had to do with a Mr. Williams. She testified that after returning to her home in El Dorado, Arkansas, she was advised by Mr. Williams, an employee of the Chambers Claim Service, to whom the matter had been referred by the insurance company, that no settlement of her claim could be made for a period of one year. The effort required to elicit this testimony from Mrs. Jones also detracts from its quality as substantial evidence of fraud insofar as I am concerned.
"Q. * * * Did you discuss any other subjects down there? Did you ask him any questions or discuss any other subjects?
A. Well, I asked himHe told me that he would take care of the claim and that we would have to arrive at the amount; that it was too early yet; that this kind of claim would have to run its course, was, I believe, the way Mr. Williams stated it to me, as best I remember now, and in telling this I'll say, so the jury can understand this, that I didn't know anything about it then, not anything whatsoever. I didn't know the difference between a claim or none ofStill don't know what to call it, as you can see. I knew a little bit more when these depositions were taken and know a little bit more about all of it now than I did then, but I didn't know anything about it and I believe that he said it had to run its course. It was too early in the game to do anything then, but at the end of the year or the period of a year, that we would have to tell him the figure. He'd handle everything for us in the claim except the figure; that we'd have to tell him what we wanted, the insurance company, what we wanted to negotiate over the figure and start that and I was askingQ. Now did he say anything else with reference to this twelve month period?
A. Well, I don't think I asked him a lot. Well, that did upset me and I said. `You don't mean it's going to be that long?' and he said, `Well, this is something you just can't estimate overnight'. `It's something that your condition could vary from, from time to time', and I don't remember how he consoled me with that right now. It's been too much passed since then, but he did tell me that it would be that length of time before it would be anything done.
Q. Did he comment further why it had to be that length of time? Anything else? Any further comments about the twelve months period?
A. Not that I can remember, Mr. Whetstone. He just said that it was a twelve month waiting period to evaluate a claim of this type.
Q. Well, did he explain what he means by `Waiting period'?
A. I can't remember.
Q. Well, what did you say when he said about waiting the twelve month period?
A. Well, that upset me. I knew that I had already had two hospital bills and wondered what more it was going to run into and I didn't know what to evaluate this claim meant and I didn't know anything about it, what it meant or what to expect or nothing and he said that he would go ahead and get everything together and for me to get the authorizations on to Dr. Moore and that he would take those and get the information from Shreveport and that it was a time waiting period.
Q. What do you mean `time waiting period'? Did he explain that to you?
A. He said you just can't evaluate a claim like this until after a year, a whiplash case. He said he had handled a lot of them and it just took time to evaluate them; that you couldn't tell whatever injuries you had at the end of a period would be; that that's what he had understood, *737 I believe was the explanation that he left me with.
* * * * * *
Q. Did you try to hurry him up any on the thing?
A. Yes, sir, I asked him wasn't there anything that he could do.
Q. And what did he say?
A. He said no; that there wasn't anything could be done. We just had to wait; that the insurancethere wasn't anything to worry about; that it was a liability case; that they would pay it; that it was an open and closed or open and shut case, was the way he said it. It wasn't anything to worry about. The man hit me from the rear. He was drinking and I was sitting still and it wasn't any fault of mine and the insurance company was going to pay off, just don't worry about that, but we just had to be patient with them and wait until this waiting periodthis
Q. What was this waiting period all about?
A. Well, it was just a twelve month waiting period. I knew they was going to pay us and knew it would be just the first day or the next day after the twelve months.
Q. Where did this twelve month business ever come in? Where was that ever introduced into the conversation between you and him? Who ever mentioned that?
A. Mr. Williams told me that.
Q. When did he first tell you that?
A. Just after he had finished taking the statement from me, I believe.
Q. Did he mention it any other times?
A. Well, every time I talked to him on the telephone.
Q. And you'd try to rush him up or shorten the twelve months?
A. Yes, sir, and he would ask me had we arrived at a figure yet and did I have any medical bills and whatnot and I'd tell him yes, I had a few and that we still hadn't arrived at a figure to submit to the insurance company and he'd tell me, well, that if I did to call him and let him know, but don't worry about it; that we had plenty of time; that he had to wait, but in case I did arrive at a figure to let him know."
Mrs. Jones testified that she relied on this information and these representations and made no effort to settle her claim against Kemp until a year had passed, at which time she was advised that the prescription period in Louisiana was one year; that the year had run out and that the insurance company had closed its file on her case.
This suit was filed in Union County Circuit Court against Kemp, Chambers and Whatley, d/b/a Chambers Claim Service, Tom Williams, their employee, Firemen's Insurance Company, and also attorney Brown, who had represented Mrs. Jones in settling her claim for medical benefits under the provisions of her own automobile insurance policy. The complaint contained eighty-six paragraphs and prayed judgments against Kemp, on account of his negligence and misconduct, for $46,000 in favor of Elston Jones; for $10,000 in favor of Paula Jones, a minor; for $100,000 in favor of Mrs. Jones; for $20,000 in favor of Leo R. Ezell; for $20,000 in favor of Jerry Ezell, a minor, and for $250,000 punitive damages. The complaint alleged conspiracy between Kemp and his liability insurance carrier and its agents and employees, and alleged fraud on the part of all of them in causing appellees to delay bringing an action in Louisiana for the recovery of damages for personal injuries until after the prescription period had run in that state, and in the alternative the complaint *738 prayed judgment against all the defendants in the same amounts prayed against Kemp.
The cause was submitted to the jury on the issue of fraud and the jury found in favor of all the defendants except the insurance company, and rendered a verdict in favor of the four appellees against Firemen's Insurance Company in amounts totaling $23,000.
At the trial Mrs. Jones testified that Williams told her, when she visited him in Texas, that the insurance company had specifically directed him to lull her into a sense of security until the Louisiana prescription period had run. Such statement was emphatically denied by Williams, who was no longer employed by the Chambers Claim Service. As a matter of fact, all of Mrs. Jones' testimony was emphatically denied, except as to the occurrence of the accident. Kemp appeared specially and testified that Mrs. Jones told him, at the scene of the collision, that she was not injured. The police officer who investigated the collision testified that the automobile driven by Mrs. Jones was knocked forward about the length of the automobile from the point of impact. Mr. Maddox testified that he made several attempts to take a statement and obtain medical authorizations from Mrs. Jones while she was in the hospital at Shreveport, but that she would not see him and that he never did see her at all. This testimony was confirmed by Mr. Foster, claims manager for Firemen's, and Mr. Maddox's supervisor. Mr. Maddox and Mr. Foster also testified that efforts were continued through the Chambers Claim Service in El Dorado to obtain medical authorizations from Mrs. Jones so that the claims could be evaluated; that Mrs. Jones would only submit medical bills but would not sign medical authorizations so that the company could determine the nature and extent of her alleged injuries, and the validity of the medical bills submitted.
In Craig v. Montelepre Realty Co., La. App., 202 So.2d 432, cited by the majority, the question of prescription was permitted to go to the jury under an instruction, as follows:
"You are charged that when a party lulls another into the belief that he will suffer no loss by his inaction, and thus induces him to refrain from claiming a debt, prescription will not begin to run until the party is undeceived."
The Craig case was an action for personal injury and property damage caused by vibrations from a pile driving operation. The instruction was not held erroneous as a matter of Louisiana law. The Louisiana court simply held that had there been a finding that the plaintiff had been lulled into inaction and therefore entitled to damages under the charge, such finding would be erroneous under the facts of that case because the evidence only showed that the defendant had promised to make final adjustments toward the end of the operation. The operation continued on for some time after the vibrations ceased, and the defendant had repaired some of the damage from time to time as it occurred. In connection with the instruction, the Louisiana court said:
"If the jury found that the plaintiff was lulled into inaction by the assurances of Mr. Montelepre in response to the corresponding charge, and was thus entitled to damages which would otherwise be prescribed, then such finding would be manifestly erroneous since the evidence adduced could in no wise indicate acts lulling the plaintiff into inaction so as to prevent the running of prescription. The acts of the defendant alleged to mislead the plaintiff must be such as to prevent him from knowing of his cause of action or must import of deliberate concealment, or fraud, or failure to perform a legal duty. This is illustrated by the cases cited by both the plaintiffs and the defendant. Odoberto v. Virgin, Peltier's Orl.App. No. 7986. Kennard v. Yazoo *739 and M.V.R. Co., La.App., 190 So. 188 (La.App.1939)." (Emphasis supplied).
When a complaint in Louisiana shows on its face that the prescription period has run, it appears to be incumbent upon the plaintiff to allege acts of the defendant, such as to prevent him from knowing of his cause of action or that import of deliberate concealment or fraud, or failure to perform a legal duty. Kennard v. Yazoo & M.V.R. Co., supra.
Instead of filing suit in Louisiana and determining in the courts of that state, whether they had actually lost their cause of action by prescription, the appellees apparently assumed that their right to maintain an action in a Louisiana court expired when they were advised by an insurance adjuster that the claim file had been closed because of the expiration of the period of prescription in Louisiana. As I see it, the appellees filed the present damage suit in Arkansas alleging loss of their cause of action in Louisiana because of the same fraud they might well have alleged in Louisiana to show that they had not lost their cause of action in that state.
Appellees have suffered no damage, and they claim none, merely because the prescription period has run in the state of Louisiana. The damage they have suffered, if any, and the damage they claim, is for the loss of their right to maintain a lawsuit in Louisiana, because the prescription period has run in that state. I find no proof in the record that such fraud as appellees allege, caused them to lose their cause of action in Louisiana. Such fraud as appellees allege in this case is the very fraud that may have suspended prescription in the state of Louisiana.
The majority say that the fraud in this case was not complete until Foster exercised his discretionary authority to rely upon the one year prescription. It seems to me that the majority is elevating the decision of a claims adjuster, in the exercise of his discretion in handling of claims, to the decision of a judicial tribunal that is final and binding. An insurance claims adjuster, or claims representative, may exercise his discretionary authority to offer only a specified sum in settlement of a claim, but certainly such exercise of discretion has little to do with the outcome of a lawsuit. It is entirely possible that the appellant insurance company, through competent attorneys, would have taken an entirely different view toward a complaint filed in the proper court in Louisiana, then the claim agents took toward the adjustment of the claims of appellees. It is entirely possible that the appellant, on advice of counsel, would not have pleaded prescription as a defense to a complaint filed late because of such fraud as is alleged in this case. Certainly there is no actionable fraud in a statement by a claims agent that his employer will plead prescription or rely on the statute of limitation in event a suit is filed. Actionable fraud relates to a past existing fact and not to future events or occurrences. Crider v. Simmons, 192 Ark. 1075, 96 S.W.2d 471.
The majority seem to hold that a statement made by an insurance adjuster, as to the Louisiana statute of prescription, if made in Louisiana, would be a statement of law and not actionable in fraud, but if the adjuster steps across the state line and makes the same statement in Arkansas, it becomes a statement of fact and is actionable. Be that as it may, the most severe acts of fraudulent conduct complained of here, consisted of alleged statements made by Mr. Williams, an Arkansas adjuster, and made in Arkansas and Texas, pertaining to the Louisiana law. It would at least be interesting to know how the Louisiana courts would have treated the matter had it been presented to the courts of that state.
The case of Green v. Grain Dealers Mutual Ins. Co., La.App., 144 So.2d 685, cited by the majority, is no authority for how the Louisiana courts would have treated the fraud alleged by the appellees in the case at bar. In the Green case the claim agent told the plaintiff that the prescription period *740 in Louisiana was two years and that the insurance company would pay her. In the case at bar Mrs. Jones says that Williams told her that there was a waiting period of one year on this type of claim and then later told her that the insurance company had specifically instructed him to lull her into inaction until the statutory period had run. Williams denied making such statements, but if a Louisiana court had heard the testimony, and had believed Mrs. Jones, it undoubtedly would have considered such statements as more than mere statements of Louisiana law. As vague as appellee Jones' testimony is as to what Mr. Williams told her about a one year waiting period, such information of itself should have put appellee on such notice as to cause her to at least make inquiry of an attorney. If, however, a Louisiana court had excused Mrs. Jones of her lack of diligence, such court might have even found that Mrs. Jones was led to believe that she had no cause of action at all for a period of one year from the date of the accident, and that the appellant had fraudulently concealed her actual cause of action.
In my opinion the appellees showed no diligence whatever in presenting their cause of action against Kemp in Louisiana. A charge of fraud must be established by evidence that is clear. Crider v. Simmons, supra. If appellees lost their causes of action by prescription in Louisiana, I am convinced that they did so through their own delay, and not because of fraud practiced upon them by the appellant. If the alleged fraud prevented the appellees from filing suit in Louisiana within the year following the accident in that state, I am of the opinion that the courts of Louisiana, and not the courts of Arkansas, should say whether appellees have lost their cause of action in Louisiana.
I would reverse the judgment of the trial court.
BROWN, J., joins in this dissent.