**PENN MART REALTY COMPANY, a corporation of the Commonwealth of Pennsylvania, Plaintiff,**

v.

**Isadore A. BECKER et al., Defendants.**

**No. 68 Civ. 3460.**

United States District Court
S. D. New York.

June 9, 1969.

Wolf, Popper, Ross, Wolf & Jones, New York City, Cohen, Morris & Rosenthal, Wilmington, Del., of counsel, by Irving Morris, and J. A. Rosenthal, Wilmington, Del., for plaintiff.

Donovan, Leisure, Newton & Irvine, by Samuel W. Murphy, Jr., New York City, for defendant Investors Diversified Services, Inc.

## OPINION

TYLER, District Judge.

Plaintiff Penn Mart Realty Co. ("Penn Mart") sues derivatively for the benefit of Glen Alden Corporation ("Glen Alden") under Section 10(b) of the Securities Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. 240.10b–5, promulgated thereunder.[1] The defendants are Investors Variable Payment Fund, Inc. ("Variable"), an open-end diversified investment company; Investors Diversified Services, Inc. ("IDS"), the fund's investment manager; Carter, Berlind & Weill, Inc., a securities broker-dealer; and the individuals who comprised the Glen Alden board of directors during the relevant period.

IDS has moved for an order dismissing the complaint pursuant to Rule 12(b) F.R.Civ.P. on the grounds that the first count fails to state a federal claim upon which relief can be granted, and that the court lacks subject matter jurisdic-

---

1. There is also a pendent state claim, denominated "Count 2".

tion over the pendent state claim in Count 2 once the federal claim fails.

## I.

### Plaintiff's Allegations

The complaint alleges the following transactions relating to the common stock of Schenley Industries, Inc. ("Schenley"):

Between February 1, 1968 and February 23, 1968, Glen Alden acquired 92,700 shares of Schenley common in New York Stock Exchange transactions through Carter, Berlind as broker. On February 8, 1968, representatives of Glen Alden had a meeting, which was arranged by Carter, Berlind, with IDS, at which material inside information about Glen Alden affairs was disclosed to IDS in order to assist them in making investment decisions concerning Glen Alden and its related companies. Such information included the fact that Glen Alden intended to make a tender offer in the immediate future to acquire all the outstanding shares of Schenley. On March 14, 1968, Glen Alden sold its 92,700 shares of Schenley common to Variable in a New York Stock Exchange transaction through Carter, Berlind at $63 per share. Prior to March 20, 1968, the Glen Alden board had decided to make the tender offer for Schenley common for a purchase price equivalent to or in excess of $80 per share.[2] On March 20, 1968, Glen Alden acquired 945,126 shares of Schenley common from Lewis S. Rosenstiel and related persons at a purchase price of $80 per share, and the sale was announced to the investing public.[3] Plaintiff contends in this suit, therefore, that Glen Alden was injured in the amount of approximately $1,500,000 by the sale of the 92,700 shares of Schenley common to Variable at an allegedly bargain price of $17 per share less than was paid to the Rosenstiel group.

In order to avoid a dismissal of the complaint with prejudice, plaintiff's counsel states in its brief in opposition to this motion that plaintiff could allege certan additional facts which would cure any deficiency in the complaint as it now stands.[4] Although these facts are somewhat complicated, in summary they amount to an allegation that the reason for the sale of the 92,700 shares of Schenley common to Variable was to enlist the aid of IDS and Variable in accomplishing Glen Alden's imminent takeover attempt on Schenley.

## II.

### The *Schoenbaum* Decision

IDS claims that dismissal of this federal claim is required by a recent decision of the Court of Appeals for the Second Circuit, Schoenbaum v. Firstbrook, 405 F.2d 215 (2d Cir. 1968) (en banc) cert. denied sub nom. Manley v. Schoenbaum, 395 U.S. 906, 89 S.Ct. 1747, 23 L.Ed.2d 219 (May 19, 1969), which displaced an earlier three-judge panel decision of the same court, 405 F.2d 200 (2d Cir. 1968). For convenience, I will hereinafter refer to the decision of the three-judge panel as *Schoenbaum I*, and to the decision of the court sitting *en banc* as *Schoenbaum II*.

The factual pattern in *Schoenbaum* is similar to the case presently before me. Plaintiff, a stockholder of Banff Oil Ltd. ("Banff"), sued derivatively for the benefit of Banff, alleging that the board of directors had sold 500,000 shares of

---

2. Plaintiff does not specifically allege that at the time the sale to Variable was consummated that the Glen Alden board knew that the price at which it would make the tender offer was substantially $80 per share. Nor does plaintiff allege that knowing the offering price, the Glen Alden board communicated the price to IDS and Variable at the time of the sale. For purposes of this motion to dismiss, however, I infer from other allegations of the complaint that these two facts are asserted by plaintiff.

3. Apparently, it was on this day that Glen Alden also announced its tender offer to the shareholders of Schenley. See Plaintiff's Brief, p. 6.

4. At oral argument, plaintiff's counsel tacitly admitted that the present complaint is deficient and stated that he would place before the court all facts which he could allege in good faith.

treasury stock to Aquitaine Company of Canada, Ltd. ("Aquitaine") and 270,000 shares of treasury stock to Paribas Corp. ("Paribas") at bargain prices,[5] both sales having been made while the board and the two purchasers were aware of inside information of oil discoveries made by Paribas. At the time of its purchase, Aquitaine was a controlling shareholder of Banff, while Paribas bought as an unrelated third party.[6] In addition, Aquitaine had placed three directors on Banff's eight man board, although the Aquitaine directors did not vote when the board passed on the Aquitaine transaction. In that case, as here, defendants argued that because the board of directors of Banff had all information available to the purchasers, the fraud provisions of Section 10(b) and Rule 10b–5 were inapplicable.

In *Schoenbaum I*, the majority analyzed this question in traditional agency terms. The court stated:

"A corporation can act only through its agents and officers and can know only what its agents and officers know. * * * If the persons entitled in the ordinary course to participate in authorizing a securities transaction on behalf of the corporation have not been fully informed, it may be said that the corporation has not been fully informed. * * * In general, if the corporation's agents have not been deceived, neither has the corporation. However, as in other situations governed by agency principles, knowledge of the corporation's officers and agents is not imputed to it when there is a conflict between the interests of the officers and agents and the interests of the corporate principal. * * * Therefore, a corporation may be defrauded in a stock transaction even when all of its di-

rectors know all of the material facts, if the conflict between the interests of one or more of the directors and the interests of the corporation prevents effective transmission of material information to the corporation, in violation of Rule 10b–5(2). * * * *"
(Citations and footnote omitted.) 405 F.2d at 211–212.

The majority then concluded that because the Aquitaine directors abstained from voting on the sale to Aquitaine, there was no conflict of interests on the part of members of the board that would bar imputing the knowledge of the board to the corporation.[7] The court did not discuss the Paribas transaction, apparently because it regarded it as an *a fortiori* problem after decision on the Aquitaine transaction.

Judge Hays, in dissent, criticized the majority for applying wooden agency principles to this type of case. As he put it:

"Endowing a corporation with a fictitious 'personality,' so that, for example, it has 'knowledge,' is a useful device for the analysis of many problems. But it can also constitute a trap for the unwary when they ascribe reality to the fictions. What the majority is actually saying is that since the directors *were* the corporation for the purposes of the questioned transactions the corporation must have known what the directors knew, or, in other words, the directors knew what the directors knew. There is, of course, no justification for interposing the corporate fiction between the directors and the minority stockholders who were the victims of the directors' fraudulent actions. In order to establish fraud it is surely not necessary to show that the directors deceived themselves. It must be enough to

---

5. The sale to Aquitaine was at $1.35 per share; the sale to Paribas at $7.30 per share.

6. Apparently, the complaint alleged that Paribas was acting for persons affiliated with Acquitaine. 405 F.2d at 205, 214. But the majority in *Schoenbaum II* stated that "Paribas * * * [was], so

far as appears, unconnected with Banff * * *."

7. It should be noted that one factor that weighed heavily in the court's decision was that the defendants had produced affidavits based on personal knowledge controverting most of the facts relied upon by plaintiff, while plaintiff did not put in any relevant affidavits.

show that they deceived the shareholders, the real owners of the property with which the directors were dealing. Deception of the shareholders (with the exception of the majority stockholder which was a party to the transactions) is established by showing that the directors withheld from them information that would have revealed the true value of the treasury stock." 405 F.2d at 215.

The majority opinion in *Schoenbaum II*, written by Judge Hays, reached a conclusion opposite to that reached by the three-judge panel on the Aquitaine transaction, but reaffirmed the panel's decision as to Paribas. Concerning the Aquitaine transaction the court stated:

"In the present case it is alleged that Aquitaine exercised a controlling influence over the issuance to it of treasury stock of Banff for a wholly inadequate consideration. If it is established that the transaction took place as alleged it constituted a violation of Rule 10b–5, subdivision (3) because Aquitaine engaged in an 'act, practice or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.' Moreover, Aquitaine and the directors of Banff were guilty of deceiving the stockholders of Banff (other than Aquitaine)." 405 F.2d at 219–220.

In contrast, the court concluded that Paribas could not be held liable under Rule 10b–5, using the following language, which is relied upon by defendants in the instant case:

"As to Paribas it appears that the negotiations for the purchase of treasury stock were arm's length negotiations. There is no reason to believe that Paribas was in possession of any information not available to Banff

and, more importantly, there is no reason to believe that Paribas was in any position to influence the judgment of the Banff directors by any improper means. Paribas and the purchasers whom it represented were, so far as appears, unconnected with Banff and unable through ownership of Banff stock or otherwise to bring any pressure on Banff to sell its stock at a price below its true value. For these reasons the dismissal of the complaint as to Paribas is affirmed." 405 F.2d at 219.

### III.

#### The Sale of the Schenley Stock

██ Perhaps it would be enough to say that the complaint against IDS must be dismissed on the precedent of *Schoenbaum II*, since IDS is in almost the same situation as was Paribas. It might be helpful, however, to describe more fully the reasons that Section 10(b) and Rule 10b–5 have not been violated by IDS.

The critical issue here, as in *Schoenbaum* and cases like it,[8] is this: under what circumstances does full knowledge of material inside information by the board of directors of a corporation selling securities adequately protect the shareholders from the deceptive practices prohibited by Section 10(b) and Rule 10b–5.[9] Since the board of directors as the governing body of the corporation is authorized to represent the corporation (and hence the shareholders) in these securities transactions, shareholder protection under Rule 10b–5 is normally assured if the board is fully informed. Section 10(b) and Rule 10b–5 do not require more even if the directors make such a serious mistake as to amount to a waste of corporate assets by selling the securities at far too low a price.[10] It should be apparent that each shareholder cannot be informed in

---

8. See, e. g., Continental Bank and Trust Co. of Salt Lake City v. Garfinkle, 292 F.Supp. 709 (S.D.N.Y.1968).

9. In posing the crucial question, we are concerned only with sales of securities which the board is permitted under state

law to accomplish without shareholder approval. If shareholder approval is necessary, full disclosure to shareholders is necessary.

10. Apparently the minority in *Schoenbaum II* construed the majority opinion to al-

all instances where the corporation sells securities while in possession of material inside information. To require such disclosure would strangle corporate investment sources whenever good business reasons dictate the withholding from the public of material information.

Where, however, all directors are aware of all the facts, but a majority of the board is controlled by the purchaser or a majority of the board has a conflict of interests in the transaction, shareholders are not protected under these anti-fraud provisions. The reason should be very clear. Just as the board cannot protect shareholder interests where it has been deceived by the outside purchaser, so it will not protect shareholders where it is controlled by the purchaser or a majority of its members have other interests in the transaction.[11] Thus, the court in *Schoenbaum II* was unwilling to conclude that the corporation's (i. e. the minority shareholders') rights would be safeguarded by a board majority which may have been directly controlled by Aquitaine. 405 F.2d at 219–220. See also Continental Bank and Trust Co. v. Garfinkle, 292 F.Supp. 709 (S.D.N.Y.1968).

Plaintiff does not allege that any of the directors of Glen Alden had a conflict of interests concerning the sale to Variable. In an effort to allege "improper influence" by Variable and IDS over the Glen Alden board, plaintiff states in its brief that the reason Glen Alden's board was willing to make the sale of Schenley at $63 per share such a short time before the tender offer was that Glen Alden was enlisting their aid in the take-over attempt on Schenley.[12] In other words, plaintiff claims that the Glen Alden board bargained with IDS and obtained not only the $63 per share price for the stock, but also a promise to aid in the tender offer, a service to Glen Alden the value of which is presently unknown. Whatever the value of the package deal alleged by plaintiff, it cannot allege that the board did not at all times act in the interests of the corporation (and hence in the interests of all shareholders) in this transaction. The directors may have bargained poorly; they may even have wasted Glen Alden's assets. But these allegations do not disclose deception of the type prohibited by Rule 10b–5.

Put differently, plaintiff cannot bring itself under the part of *Schoenbaum II* dealing with the Aquitaine transaction because it cannot allege "improper influence" by the purchaser over the board of directors of Glen Alden. When the court spoke of the ability to influence the board, it was not referring to the normal bargaining power of any stock purchaser, nor even of the bargaining power of a large institutional purchaser like Variable.

IV.

Conclusion

■■ In accordance with the views expressed herein, Count 1 must be dismissed since it fails to state a federal claim. It is dismissed with prejudice, since plaintiff's counsel has not been able to show or suggest additional facts to be alleged that would cure the deficiency. In addition, Count 2, the pendent state claim, must be dismissed. United Mine Workers of America v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

It is so ordered.

---

low a Section 10(b) claim whenever such a waste of corporate assets is alleged. If such were the law, their observation that "[t]his does indeed open the floodgates" might be an accurate one. 405 F.2d at 220.

11. Since plaintiff cannot allege that any member of the Glen Alden board was

so affected, I need not consider the effect of a conflict of interests affecting a minority of the board.

12. In fact, plaintiff's counsel claims that Variable engaged in a profitless transaction during the tender offer period, the effect of which was to aid Glen Alden in its bid.