Thomas B. BAILEY, Plaintiff,

v.

MEISTER BRAU, INC., et al.,
Defendants.

Nos. 69 C 1938, 71 C 114.

United States District Court,
N. D. Illinois, E. D.

Sept. 27, 1973.

Donald Page Moore, Arthur W. Hahn, Pope, Ballard, Shepard & Fowle, Chicago, Ill., for plaintiff.

George W. Hamman, Mayer, Brown & Platt, Roger Pascal, Schiff, Hardin & Waite, Richard Mueller, Lord, Bissell & Brook, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

McLAREN, District Judge.

This cause was tried to the Court without a jury. The following opinion shall constitute the Court's findings of fact and conclusions of law for the purposes of Fed.R.Civ.P. 52(a).

### Background

From 1953 to 1962, plaintiff Thomas B. Bailey ("Bailey") worked for J. L. Read Foods, Inc. ("Read") in Streator, Illinois. In April 1962, the James H. Black Company ("Black Company") acquired Read's Streator plant and hired Bailey as chief operating officer. Bailey was then elected president, treasurer, and a director of the company. Over the years, James H. Black, Sr. ("Black Senior"), the majority shareholder of the company, sold a total of 3000 of his shares to Bailey, and the Black Company granted him options to purchase an additional 15,000 shares.

In July 1966 Bailey entered into a new employment agreement which provided, *inter alia*, for:

(a) employment by the Black Company for a term of fifteen years (except in the event of the sale of the company, in which event the term was to have been five years);

(b) compensation of not less than $3000 per year plus an annual bonus computed at 7½% on the first $200,000 of the company's net profit before federal taxes on income, an additional 5% similarly computed on the next $400,000 of net profit, an additional 2½% similarly computed on the next $400,000 of net profit; and

(c) retirement payments of $15,000 per year for life upon completion of the fifteen year term of the contract.

The agreement, which was signed by Black Senior as chairman of the board of the Black Company, also included the following provision:

"The sellers of the majority of the shares of the common stock of the company (whether Black or his estate or heirs) shall give to Bailey a sixty (60) day right of first refusal to meet any offer to purchase such shares. Notice to Bailey shall be in writing, postage prepaid, certified or registered mail and shall contain a bona fide copy of the offer which must be in writing."

The agreement was drafted by defendant Robert S. Foster ("Foster"), an attorney, at the direction of Black Senior. Foster had served since April 1962 as legal counsel, secretary, and a director of the Black Company.

Upon Black Senior's death in October 1968, defendant Continental Illinois National Bank and Trust Co. ("Bank") of Chicago qualified as executor of his estate and Foster was appointed as attorney for the estate and investment advisor to the executor. It was soon determined that the estate, with Black Company stock as practically its only asset, had a liquidity problem and that the stock should therefore be sold.[1] After obtaining a waiver by defendant James H. Black, Jr. ("Black Junior") of his right under his father's will and codicil

---

[1] As noted above, Bailey owned 3000 shares of Black stock. At the time of his death, Black Senior owned 57,000 of the 70,000 issued and outstanding shares and Mrs. Wilhelmina Harre ("Mrs. Harre") owned 10,000. Mrs. Harre and her husband, who served as a director of the Black Company, were dismissed as defendants in this action pursuant to a settlement with Bailey prior to trial, without prejudice to the complaint's allegations that they conspired with the other defendants.

to operate the company, prospective purchasers were sought. A series of meetings beginning late in 1968 between Bailey, Foster, defendant Robert G. Mullen ("Mullen"), an officer in the Bank's estate administration department, and other Bank employees culminated in Bailey's offer in March 1969 to purchase the estate's shares and those of the only other shareholder, Mrs. Harre. While the amount of the offer was within the range which the Bank had computed, both the Bank and Foster felt that the terms for its financing were not in the best interest of the estate and rejected it.

Foster contacted several other prospective purchasers, but his efforts were unsuccessful until the president of Meister Brau, Inc. ("Meister Brau")[2] made an offer on April 11, 1969 of $950,000 for the shares of the estate and Mrs. Harre. A few days later, a Bank employee sent Bailey a copy of the offer. On April 30, the Meister Brau board of directors ratified the offer and resolved that it would remain open until July 8. On May 6, Foster sent Bailey a copy of part of the minutes of the Meister Brau board meeting by registered mail. Bailey's attorney notified Mullen and Foster, by a letter dated May 8, 1969, that Bailey would notify them within the period provided in his employment agreement that he would meet the terms of the Meister Brau offer. Neither Foster nor Mullen advised anyone else connected with the transaction of their receipt of this letter.

At the annual Black Company shareholders' meeting on May 16, Foster, defendant Charles E. Schaeffer, a trust officer of the Bank, defendant Mrs. Black (Black Senior's widow), Black Junior, Mrs. Harre, and defendant Ronald T. Cappadocia ("Cappadocia"), a senior vice president of Meister Brau, were elected to the board of directors, with the Bank voting the estate's shares for that slate at Foster's direction. Bailey was not reelected to the board. Immediately after the shareholders' meeting, the new board:

(1) elected Cappadocia as its chairman;

(2) appointed Cappadocia as president and Bernard M. Berry,[3] the Black Company comptroller, as treasurer, and removed Bailey from these positions; and

(3) reduced Bailey's salary by $5000 per year (to the contract minimum of $30,000) retroactive to March 1, 1969.

On May 28, Meister Brau offered to indemnify the estate, the Bank, Mr. and Mrs. Harre, Foster, and Schaeffer against liability to Bailey if they would accelerate the closing date to June 6.

On June 6, without notice to Bailey, the following transactions took place:

(1) Meister Brau's offer of indemnification was accepted;

(2) the Black Company board caused the transfer of all of the company's assets to the Black Products Company of Delaware, Inc. ("Black Products") in exchange for all of the stock of Black Products;

(3) the Bank and Mrs. Harre as majority stockholders and the Black Company board caused the transfer of all of the Black Products stock to Meister Brau in exchange for 70,000 shares of unregistered (with the Securities and Exchange Commission) Meister Brau stock;

(4) Meister Brau purchased all of the Black Company stock held by Mrs. Harre and the estate for $950,000;

---

2. Although Meister Brau is named as a defendant in this action, it was severed from the case prior to trial due to an order in its Chapter XI bankruptcy proceeding restraining all suits against it.

3. Prior to trial, Bailey dismissed Mr. Berry without prejudice to plaintiff's claim against the other defendants or to the claim that Berry was a co-conspirator in the tortious acts alleged in the complaint.

(5) the Black Company, by Cappadocia, its president, agreed to indemnify Meister Brau for liability and loss arising from the acquisition of the Black shares; and

(6) Meister Brau promised that it would not sell, pledge or mortgage any of the Black Company's assets (which now consisted solely of Meister Brau Stock) without the consent of the Bank as long as it remained indebted to the Bank as executor on the note it gave in partial payment of the purchase price of the estate's Black Company stock.

After these transactions were concluded, Cappadocia, as president of the Black Company, handed Bailey a letter discharging him "for cause."

On June 9, Bailey signed and caused his attorney to deliver to the Bank a letter stating that he had elected to meet all the terms and considerations of the Meister Brau offer and was prepared to do so. He also caused his attorney to tender to the Bank a cashiers check payable to it in the amount of $25,000. Muller advised the attorney that the estate had sold its stock to Meister Brau, but refused to discuss with him the terms of the sale. By a letter dated June 12, Meister Brau offered to sell its Black Company stock to Bailey for $950,000 in cash, but advised him that the Black Company's only assets were Meister Brau stock and any residual rights it might have in his employment agreement.

The foregoing is of course not an exhaustive statement of all of the relevant facts brought out at trial. Other findings will be made as necessary in the sections below which deal specifically with liability and damage under each count.

*Counts I and II*

*Liability*

These counts allege that defendants conspired with Meister Brau, Cappadocia, Berry and the Harres to defraud the Black Company and Bailey, in violation of Rule 10b–5,[4] by exchanging Black's assets for Meister Brau stock worth less than half the value of the assets (the "assets transfer"). Count I is a derivative action on behalf of the Black Company and Count II claims damages for Bailey individually.

Schoenbaum v. Firstbrook, 405 F.2d 215 (2d Cir. 1968) (en banc), cert. denied, 395 U.S. 906, 89 S.Ct. 1747, 23 L.Ed.2d 219 (1969); Penn Mart Realty Co. v. Becker, 300 F.Supp. 731 (S.D.N.Y.1969), and Continental Bank & Trust Co. v. Garfinkle, 292 F.Supp. 709 (S.D.N.Y.1968), which Judge McGarr relied upon in holding that Count I stated a claim, Bailey v. Meister Brau, Inc., 320 F.Supp. 539, 542–543 (N.D.Ill.1970), teach that if the controlling shareholder or directors of a corporation cause the corporation to participate in a securities transaction in which they have a conflict of interest without disclosing to the other shareholders information in their possession which reflects upon the fairness of the transaction, their acts constitute a violation of Rule 10b–5.

Each of the defendants owed a fiduciary duty to the Black Company. The Bank, by its employees and officers, acted as its controlling shareholder; the rest of the defendants were directors. All of the defendants, because of their interest in seeing Meister Brau purchase the estate's shares, had a conflict of interest in the related transfer of the company's assets. The transfer was viewed as nothing more than an accommodation to Meister Brau. The few defendants who even considered the value of the Meister Brau stock performed nothing

---

4. 17 C.F.R. § 240.10b–5. These counts also allege that defendants' acts violated § 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), pursuant to which Rule 10b–5 was promulgated, and § 17(a) of the Securities Act, 15 U.S.C. § 77q(a). Because proof of a violation of the rule would also amount to proof of violations of the two statutes in this case, the Court will refer only to the rule in the text.

more than a cursory investigation of it. Had those defendants with sufficient business backgrounds and understanding of the transactions of June 6 considered the asset transfer from the standpoint of the Black Company, rather than the estate, they could easily have realized what the record so clearly establishes— the Meister Brau stock was worth far less than the Black Company's assets.

■■ Although the evidence fails to show any conspiracy as alleged in Counts I and II, the Court finds that the actions of certain defendants constituted violations of Rule 10b–5. Foster and the Bank, by Mullen, Schaeffer and other employees, by reason of their understanding of the June 6 transactions and knowledge of financial matters, were grossly negligent in failing to recognize the unfairness of the asset transfer. Mrs. Black and Black Junior had little if anything to do with the structuring of the transactions and it is doubtful that they, even if they were aware of the factors which so greatly affected the value of the Meister Brau, stock, could have realized the unfairness of the assets transfer.[5]

■ Had defendants actually known of the unfairness of the assets transfer and failed to disclose this information to Bailey, they would clearly be guilty of violating Rule 10b–5 under the reasoning of *Schoenbaum* and its progeny. In other types of cases under the rule, the courts have not required actual knowledge of falsity of representations or actual knowledge of information where there is a duty to disclose in order to find violations. See 2 A. Bromberg, Securities Law; Fraud, § 8.4 (1971); Bucklo, Scienter and Rule 10b–5, 67 New. U.L.Rev. 562 (1972). Although there appears to be no reported decision on this issue the Court sees no reason not to extend the *Schoenbaum* reasoning to the situation where the fiduciary, blinded by a conflict of interest, wantonly ignores evidence of the unfairness of a securities transaction to the corporation and therefore fails to disclose this evidence to those shareholders whose interests lie with the corporation. In such a case, the shareholders are deprived of any opportunity to attempt to protect the corporation[6] just as if the controlling shareholders or directors, with actual knowledge of the information showing the unfairness, failed to inform them.

■ Although evidence is lacking that defendants actually knew that the Meister Brau stock was worth less than the assets, they did know that the stock was unregistered, that Meister Brau did not make any commitment to register it in the future, and that Meister Brau, as the new controlling shareholder of the Black Company, was not permitted to cause the company to sell the Meister Brau shares without the Bank's permission so long as it remained indebted on the note. An expert witness for plaintiff testified that the Meister Brau stock, by reason of its unregistered nature, was only worth 50% of its market value had it been registered—$451,500. Although this seems to be a somewhat drastic discount, when it is considered that there was no promise by Meister Brau to register the stock in the future and its marketability was even further limited by Meister Brau's promise not to cause the company to sell it, the expert's valuation does not appear unreasonable. Knowing of these factors affecting the value of the Meister Brau stock, defendants, even though not experts, should have known of the unfairness of the

---

5. In light of this, the Court finds that Mrs. Black and Black Junior are not liable under Count I. In addition, the Court finds that at all times Schaeffer and Mullen were acting within the scope of their duties as officers of the Bank and that the Bank, but not they, are liable for their acts under this count. For brevity, all references to "defendants" through the end of the discussion of Counts I and II shall mean the Bank, Schaeffer, Mullen and Foster.

6. One method by which the shareholders may act to protect the corporation if proper disclosure is made to them is suggested in Popkin v. Bishop, 464 F.2d 714, 720 (2d Cir. 1972).

transactions had they considered it from the company's viewpoint, rather than being engrossed in the interests of the estate.

■ It might be argued that defendants' conduct amounts to nothing more than corporate mismanagement or breach of fiduciary duty, actionable only under state law. But there is more here than that. The acts of these defendants are, the Court believes, of the same nature as those considered in other contexts to be deceptive within the meaning of Rule 10b–5 and they touched a securities transaction. Superintendent of Ins. v. Bankers Life & Cas. Co., 404 U.S. 6, 12, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971). When viewed as limited by these circumstances, the decision that these defendants have violated the rule does not extend the reach of the rule to all acts of corporate mismanagement. or breaches of fiduciary duty touching securities transactions without such a deceptive effect or all such acts with such an effect but without any connection to a securities transaction.

■ The Court concludes that the Bank and Foster are jointly and severally liable under Count I to the Black Company for violating Rule 10b–5. Count II was dismissed by Judge McGarr under the doctrine of Birnbaum v. Newport Steel Corp., 193 F.2d 461 (2d Cir.), cert. denied, 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952). Bailey v. Meister Brau, Inc., 320 F.Supp. at 544. It was reinstated by this Court in an opinion dated September 29, 1972, on the ground that its insufficiency had been cured by the addition of allegations that Black Senior and Foster agreed in 1966 to defraud Bailey by drafting the signature to the contract so that the "right of first refusal" would be unenforceable. However, the evidence under Count III, establishes that the "right" was enforceable. Thus there is a failure of proof under Count II and that count is dismissed.

*Damages*

■ As Bailey recognizes, his damages under Count III are duplicative of his pro rata share of the damage to the Black Company under Count I. It would be unfair, the Court believes, to assess the full damages to the company against the defendants found liable under Count I because Meister Brau, which is the prime beneficiary of the wrong and has already benefitted from the Black Company's loss by acquiring its assets at a bargain price, would receive the principal benefit of such damages as the majority shareholder of the company. Because the same defendants are found liable under Count III, the Court will enter judgment and damages in the full amount shown under that count, but only judgment of liability on Count I. Thus Bailey will be compensated for his full damages without duplication and Meister Brau will not be unjustly enriched.

*Count III*

*Liability*

This count alleges that Meister Brau, the Harres, Berry, Cappadocia, and the defendants conspired to and did commit the common law tort of intentional interference with contractual relations against Bailey.[7]

■ The essential elements of the tort charged are: (1) the defendants' knowledge of the contract between plaintiff and the third party, (2) defendants' unjustified inducement of the third party to breach or otherwise render impossible the performance of the contract, (3) the subsequent breach or other such act by the third party, and (4) damage to plaintiff. See *e.g.*, Mellor v. Budget Advisors, Inc., 415 F.2d 1218, 1221 (7th Cir. 1969); Republic Gear Co. v. Borg-Warner Corp., 406 F.2d 57, 61 (7th Cir.), cert. denied, 394 U.S. 1000, 89 S.Ct. 1596, 22 L.Ed.2d 777 (1969); General Capital Corp. v. U. S. Family Sporting

---

7. Bailey was allowed to amend Count III at trial to incorporate the fraud allegations of Counts I and II. This claim is discussed above in connection with those counts.

Goods, Inc., 351 F.Supp. 364, 367 (N.D. Ill.1972).

■■■■ The contract asserted by Bailey is the "right of first refusal" provision of his 1966 employment agreement.[8] The record shows that Meister Brau and its alleged co-conspirators were aware of this agreement; indeed, the indemnity agreement alone which makes specific reference to that provision of Bailey's contract, is sufficient evidence of knowledge by Foster, the Harres, and Mullen and Schaeffer (and therefore the Bank). It is also clear that the Bank, by secretly selling the estate's Black Company stock to Meister Brau prior to the end of the sixty-day period provided by the right of first refusal, rendered the performance of that agreement impossible. As will be shown below, Bailey suffered damages as a result of this act. The remaining issues on liability are:

(1) was the destruction of Bailey's right of first refusal unjustifiably induced?

(2) who, if anyone is liable for inducing or conspiring to induce this injury?

■■■■ Before examining the law and evidence on these issues, the Court first notes that certain of the defendants clearly cannot be found liable on this count. There is no evidence that defendants Mullen and Schaeffer acted outside the scope of their duties as officers of the Bank. They therefore could not, as a matter of law, have conspired with the Bank, Pearson v. Youngstown Sheet & Tube Co., 332 F.2d 439, 441–442 (7th Cir. 1964); Harris Diamond Co. v. Army Times Publ. Co., 280 F.Supp. 273, 276 (S.D.N.Y.1968); John Deere Co. v. Metzler, 51 Ill.App.2d 340, 201 N.E.2d

478, 486 (1964), although the Bank may be liable as a conspirator for their acts. As to Mrs. Black and Black Junior, the record is devoid of any evidence tending to show that they induced or conspired to induce the destruction of Bailey's right of first refusal. Accordingly, the Court finds that Mullen, Schaeffer, and the Blacks are not liable on Count III.

■■■■ Foster and the Bank admit in their post-trial briefs, and the Court finds, that Meister Brau's offer of indemnity induced the injury to Bailey's contractual right. The Bank argues that it cannot be liable for inducing the breach of its own contract. This contention misses the mark for two reasons. First, the Bank was not a party to the agreement in the normal sense. The estate, not the Bank, is named in the right of first refusal. Thus, the Bank can be viewed as having interfered with Bailey's contractual relations with the estate. Secondly, even if the Bank is considered to be a party to the contract, it can be held liable if it conspired with others to induce the breach as is charged here. Blivas & Page, Inc. v. Klein, 5 Ill.App.3d 280, 282 N.E.2d 210, 214 (1972); Wade v. Culp, 107 Ind.App. 503, 23 N.E.2d 615 (1939) (en banc); cf. National Gas Appliance Corp. v. Manitowoc Co., 311 F.2d 896, 900 (7th Cir. 1962).

The principal contention of the Bank and Foster is that Bailey's own conduct provided the justification for the inducement and their alleged complicity, or constituted a breach of the employment agreement so that he had no right which was interfered with.

■■■■ Bailey's conduct may not have been without fault, but considering the situation, which was created in part by

---

8. Defendants appear to have dropped their initial contention that the provision is invalid because Black Senior failed to sign the agreement in his personal capacity. In any event, assuming that a valid agreement is a prerequisite to a claim such as that stated here, Weiland Tool & Mfg. Co. v. Whitney, 100 Ill.App.2d 116, 241 N.E.2d 533, 540–541 (1968); W. P. Iverson & Co. v. Dunham Mfg. Co., 18 Ill.App.2d 404, 152 N.E.2d 615, 619 (1958); but see Harper, Interference With Contractual Relations, 47 Nw.U.L.Rev. 873, 879 (1953), the Court holds that the provision asserted was valid and enforceable. Frank Rosenberg, Inc. v. Carson Pirie Scott & Co., 28 Ill.2d 573, 583–584, 192 N.E.2d 823, 829 (1963); Ramsay Realty Co. v. Ramsay, 135 Iowa 612, 113 N.W. 468, 469 (1907).

his contract and worsened by his replacement as president by Cappadocia, it was no worse than might be expected of any person in that situation and did not, the Court finds and holds, constitute a breach of his employment agreement (even assuming that such a breach would terminate his right of first refusal) or provide justification for interference with his contractual rights.

Although Bailey may have said to Foster that he would wreck the company if he could not have it, the Court cannot believe that any defendant honestly thought that he was in a position to or would in fact destroy that which he so intensely desired to own. Although the Bank may have interpreted Bailey's statements regarding his close relations with valued customers of the company as such a threat; the Court finds that the evidence will not support a finding that he expressly threatened to take these customers with him if he failed to acquire the company. And even if the Bank and Foster had feared that he would carry out such threats, this simply should have given them greater pause before they dishonored his right of first refusal.

When prospective purchasers of the company visited the plant, Bailey warned them of the existence of his right of first refusal. On one occasion, when a visitor criticized the purchasing practices of the company, Bailey treated him curtly during the rest of the visit. Foster, who told others that Bailey had treated prospective purchasers badly, never complained to Bailey and, in fact, allowed Bailey to show another interested party the plant after his alleged misconduct.

On May 16, while still shocked at having lost his presidency and directorship, Bailey suggested that Berry quit the company until Bailey could complete his purchase of it and offered Berry a loan to carry him through until that time. Berry refused and Bailey never renewed the suggestion. Later that day, after Black Junior and Cappadocia advised them of what had taken place, Bailey told the company employees that he had the right to meet Meister Brau's offer, but asked them to continue doing their work as usual. During the following weeks, former members of Bailey's management staff met several times at his house to discuss his acquisition plans. A few hours per week were spent in this manner at the office, with Cappadocia's knowledge. There is no evidence that this interfered with the performance of their duties to the company. Bailey was given no duties by Cappadocia, but he continued to work on a sales presentation which was ultimately successful. When Cappadocia ordered Bailey to relinquish his company credit cards and the keys to the company car and told him not to leave the office during working hours, Bailey complied. Although there is evidence that the Black Company sales manager tried to keep plant employees from cooperating with Cappadocia, it was not established that he did this at Bailey's direction. Bailey apparently attempted for the first time to be friendly with some of the plant employees during this period, but this did not contribute to any disruption of work; if anything, the employees seemed to be annoyed with Bailey for these actions.

In all, it is clear that the situation at the plant from May 16 until June 6 was tense. But if Bailey's actions contributed to this situation, so too did the presence of Cappadocia. This could only add to the employees' anxiety over the outcome of the contest for control.

Defendants' theory is that Bailey's conduct placed them in a position where they had to choose between losing the Meister Brau offer and causing the breach of Bailey's right of first refusal and that their duty to obtain the best offer for the estate's shares justifies their choice. Much of Bailey's conduct discussed above was not known to the Bank and Foster until after they made their choice, however, and therefore provides no justification for their conduct. Further, the defendants were made aware of Bailey's continuing efforts to

meet the Meister Brau offer by the May 8 letter of his attorney. Even if they felt that they were in an "impossible" situation, they had only to contact Bailey to find (as it turned out) that he had arranged to meet the offer. Instead, they acted without even notifying him of their decision.

The question of justification is essentially one of good faith. See Mellor v. Budget Advisors, Inc., *supra*; American Surety Co. v. Schottenbauer, 257 F.2d 6, 13 (8th Cir. 1958). In light of their knowledge of the situation, the Court finds that the Bank and Foster could not have reasonably believed that Bailey was seriously jeopardizing the condition of the Black Company or that he was in breach of his employment agreement. The Court concludes that those defendants combined with Meister Brau to unlawfully interfere with Bailey's right of first refusal and are therefore liable to him jointly and severally for the consequences of their tortious acts. Wade v. Culp, *supra*, 23 N.E.2d at 619.

### Damages [9]

Under the financing arrangements which Bailey had made to meet the Meister Brau offer, all of the stock of the Black Company was to be held by a new company of whose stock Bailey would own 80%. Because defendants deprived Bailey of the opportunity to purchase the 95.7% interest of the estate and Mrs. Harre [10] in the Black Company for $950,000, he was damaged to the extent of 80% of any amount by which the value of the entire company (including his 4.3%) exceeded $950,000 plus the cost of his stock.[11]

Plaintiff's expert valued 100% of the Black Company at $1.5 million. Bailey's offer in March for the 95.7% interest, which the Bank considered to be at least "in the ball park," was only $800,000. Between these two extremes, the Court finds that the price which Meister Brau paid after negotiation for the stock is the best evidence of its value.

As Bailey points out, Meister Brau actually paid more than $950,000. By agreeing to provide indemnity to the Bank, Foster, and the Harres, Meister Brau, in effect, assumed a liability of the sellers. Such a promise should be considered to be part of the purchase price. Meister Brau's counsel, in a letter to its creditors, viewed the maximum possible exposure under the indemnity agreement to be approximately $180,000, subject to mitigation by Bailey. This maximum figure should not, however, be added to $950,000. Because of the contingent (upon suit by Bailey) nature of the obligation and the fact that a deduction was expected for mitigation, the Court finds that the fair value of this element is $100,000. A reasonable approximation of the value of the entire company based upon $1,050,000 for 67,000 of 70,000 shares is therefore $1,097,009. From this amount, the cost of 100% of the company to Bailey ($950,000 plus $18,000 which he paid Black Senior for his 3000 shares), $968,000, must be subtracted. Owing to the financing arrangements he had made, Bailey is entitled to damages in the amount of 80% of the resulting figure, $103,207.20.

A direct consequence of the destruction of Bailey's opportunity to gain con-

---

9. References to "defendants" within this heading include only those who have been held liable on Count III, the Bank and Foster.

10. Although defendants have not argued the point, the Court questions whether the right of first refusal could bind Mrs. Harre. The parties have proceeded upon the assumption at trial and in their proposed findings and conclusions that Mrs. Harre would have sold her shares to Bailey had he been able to

meet the Meister Brau offer as to the estate's shares. The Court finds this assumption to be reasonable and will accordingly consider defendants' acts to have deprived Bailey of the opportunity to obtain the stock of both the estate and Mrs. Harre.

11. No allowance is made for Bailey options. The only effect of assuming that he would have exercised the options is to add $110,000, the cost of exercising them, to both sides of the equation.

trol of the Black Company was the loss of the wages and bonuses he might have caused to be paid to himself. Another result was the loss of his directorship on the board of the bank in Streator that dealt with the company and the fees for this position.

In predicting the value of the lost wages, bonuses, director's fees, and mitigation, Bailey makes several assumptions, which the Court finds to be reasonable:

(1) that he would have continued to be paid at the rate ($35,000 per year) at which he was paid in 1969;

(2) that he would receive bonuses and pension payments according to the rates fixed by his employment agreement with the Black Company;

(3) that he would retire at age 65, on February 28, 1985, and, under the United States Government's Commissioners Standard Mortality Table, would receive 94 monthly payments;

(4) that he will continue to receive a salary of $30,500 from Colonial Stores, Inc. ("Colonial" employed him in December 1969) until his retirement;

(5) that he will receive the maximum bonus of $10,000 per year from Colonial until his retirement; and

(6) six percent is appropriate for reducing future compensation to present worth.

A substantial portion of this aspect of Bailey's damage claim is comprised of lost bonuses, which depends directly upon the prospective earnings of the Black Company had Bailey won control. In May 1969, Berry prepared a projected profit and loss statement for the fiscal year ending February 28, 1970, based upon predicted sales increases supplied by Bailey. In preparation for trial, Bailey prepared a set of projections for the company for the period fiscal 1971 through fiscal 1975, again assuming increased sales, and calculating expenses by extrapolating from the Berry projection with increases in certain expenses due to increased production.

As Bailey notes, defendants introduced no evidence to refute his detailed analyses and projections. The computations therein have been found to be mathematically accurate and generally in conformance with accepted accounting principles. The Court, however, considering the entire record, especially the evidence of the somewhat checkered earnings history of the Black Company, finds the projections to be unrealistically optimistic. In 1969, the Company was just beginning to enter new markets and much of Bailey's assumed sales increases would have come from these areas. The assumptions of success of the company's entrance into these markets and the profitability of these new operations is extremely speculative. Any number of unforeseen circumstances might have prevented Bailey's bright hopes from becoming a reality.

 Bailey should not be denied a fair remedy because of the speculative nature of the injury which defendants caused him, but the Court, as trier of fact, cannot indulge what it believes to be unrealistic assumptions. In its post-trial brief, the Bank has computed Bailey's loss, accepting all of his predictions except that for bonuses. Instead of Bailey's bonus projections, the Bank computes his bonus as $7,500 per year (which exceeds his average for the previous five years). It then adds this figure to Bailey's Black Company salary of $35,000 and subtracts from the total the salary and bonuses expected from Colonial, $40,500, to arrive at a differential of $2000 per year. The Court finds that a bonus of $15,000 per year is a fairer approximation of what Bailey would have received, considering the history of the company and its chances for continued profitability with a resulting differ-

ential of $9500 per year.[12] Accordingly, the Court finds that his damage due to lost wages, bonuses, and director's fees, as mitigated, is as follows:

| | | |
|---|---|---|
| Present Worth of Salary and Bonus from Black Company less Salary and Bonus from Colonial | .... | $ 92,264 |
| Present Worth of Director Fees | .... | 14,944 |
| Present Worth of Pension from Black Company | .... | 45,172 |
| Total Compensation Discounted as of December 31, 1972 | . | $152,380 |
| LESS: | | |
| Salary and Bonus Received from Black Company | .... | 5,580 |
| Director's Fees Received | .... | 1,500 |
| Present Worth of Pension from Colonial | .... | 42,441 |
| Present Worth of Stock Option from Colonial | .... | 12,500 |
| | | $ 62,021 |
| Total Net Compensation Discounted as of December 31, 1972 | .... | $ 90,359 |

### Loss on Sale of House in Streator

A further result of Bailey's loss of his right to obtain control of the Black Company was that Bailey had to move from Streator to Atlanta, Georgia to find employment. As a consequence, Bailey was forced to sell his house for substantially less than he had paid for it. He contends that his cost, $90,308, should be used in place of fair market value in determining the loss because there is no market in Streator for such expensive houses. The cost figure, however, fails to consider any depreciation and changes in the condition of the house between time of purchase and time of sale. In a personal financial statement which he enclosed with his offer for the estate's Black Company shares, Bailey valued the house at $88,000. The Court finds this to be a fair figure from which to deduct the sale price of $67,200. Accordingly, the Court finds that Bailey's damages from the sale of his residence are $20,800.

### Other Matters

#### Punitive Damages and Mental Suffering

The Court finds that the nature of defendants' acts and any effect upon Bailey's emotions do not warrant the award of additional damages.

#### Attorneys Fees and Expenses of Litigation

 Had a "fund" been created for the benefit of the Black Company by a damage award under Count I, Bailey would have been entitled to a reasonable award for attorney's fees and expenses reflecting the time devoted to pressing that derivative claim, the vindication of the federal securities laws, and the benefit to the company. Mills v. Electric Auto-Lite Co., 396 U.S. 375, 391–397, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970). Because of duplication of Bailey's Count III damages and the inequity of any award to Meister Brau, no damages have been assessed under Count I. There appear to be no reported decisions on the issue of whether fees and expenses may be awarded in circumstances such as this. The Court believes, however, that this is an exceptional situation in which an award is within its discretion. Cf. Kahan v. Rosenstiel, 424 F.2d 161 (3d Cir.), cert. denied, 398 U.S. 950, 90 S.Ct. 1870, 26 L.Ed.2d 290 (1970). The policy of the securities laws has been enforced and but for the considerations above, a fund would have been created from which such an award could be made. The effect of such an award upon defendants will be no different than if full damages had been allowed to the company; in either event it is payable by defendants. An appropriate reduction of the award may be considered in light of the fact that only the minority shareholder, rather than all shareholders, was benefitted, but the decision on the necessity of such a reduction

---

12. The Court is quite aware that this determination is by no means a mathematical certainty, but believes that it justly and reasonably approximates this aspect of Bailey's damages, based upon all of the relevant data in the record. See Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 264–266, 66 S.Ct. 574, 90 L.Ed. 652 (1946).

need not be made until evidence is taken on this aspect of the case.

### CONCLUSION

In summary, the Court has found the Bank and Foster liable on Counts I and III and has found damages in the amount of $214,366.20 on Count III. Bailey is granted thirty (30) days from the date hereof in which to submit evidence in support of his claim for an award of attorney's fees and expenses in connection with Count I. Defendants are granted twenty (20) days thereafter in which to file a response. Upon the determination of the amount of such award, judgment will be entered for that amount and damages in accordance with the findings herein pursuant to Fed.R. Civ.P. 58.

It is so ordered.